DANIEL BARTH, a Minor, by Magdalena Barth, his Mother and Next Friend, Plaintiff-Appellee, v. THE BOARD OF EDUCATION OF THE CITY OF CHICAGO *et al.*, Defendants-Appellants.

First District (4th Division)   No. 85—538

Opinion filed February 20, 1986.

French, Rogers, Kezelis & Kominiarek, of Chicago (Richard J. French, Jerome M. Brooks, and Russell P. Veldenz, of counsel), for appellant Board of Education of the City of Chicago.

James D. Montgomery, Corporation Counsel, of Chicago (Mary K. Rochford and Sharon Baldwin, Assistant Corporation Counsel, of counsel), for appellant City of Chicago.

Fred Lambruschi, of Chicago (Sidney Z. Karasik, of counsel), for appellee.

JUSTICE JOHNSON delivered the opinion of the court:

Defendants, the board of education of the city of Chicago (hereinafter the board) and the city of Chicago (hereinafter the city), appeal from a judgment of the circuit court of Cook County. A jury found defendants liable to plaintiff, Daniel Barth, in a personal injury action. The jury awarded plaintiff $2,550,000 in damages, assessing half of the liability to the board and half to the city, for injuries that plaintiff suffered when he did not receive medical treatment for approximately one hour after receiving a blow to his head. Defendants appeal from the judgment entered on the verdict, claiming that both the jury's verdict and its assessment of liability were against the manifest weight of the evidence.

We affirm.

Since defendants contend that the jury's verdict in favor of plaintiff was against the manifest weight of the evidence, we must recite the facts of this cause in detail.

Testimony at trial adduced the following facts. On October 30, 1978, plaintiff was 11 years old and a sixth-grade student attending the McKay Elementary School, a public school located at 6901 South Fairfield Avenue, Chicago. During morning recess on this date, plaintiff and his classmates were playing "kickball," a game similar to baseball except that the batter kicks a large rubber ball. The school's physical education instructor and two teacher's aides supervised the playground. At approximately 10:35 a.m., both plaintiff and a classmate, Demetrius Evans, ran to catch the ball but, not seeing each other, collided head-on, the front of Evans' head striking the side of plaintiff's head. Both boys fell to the ground. The physical education instructor helped them to their feet and assisted them off of the playground. Crying, plaintiff held his stomach and head; he testified at trial that he had felt sick to his stomach and dizzy.

One of the teacher's aides walked the boys from the playground to the principal's office. They arrived at the principal's office at approximately 10:40 a.m. The principal was not in school that day and the assistant principal, Marion Otlewis, was in another part of the building, teaching a class. The boys sat on a bench in the office;

plaintiff bent over, still crying, holding his head and stomach. A red mark was now noticeable on the side of plaintiff's head where the blow occurred.

Approximately five minutes after the boys' arrival to the principal's office, the principal's secretary, Meredith Kelley, telephoned Evans' father, who was at home, and informed him of the accident. Kelley could not reach plaintiff's mother, Magdalena Barth, at her home, so she phoned Magdalena's employer and left a message for Magdalena to call her back. Plaintiff's teacher, Richard Firman, learned of the accident from his students and went to the principal's office to see plaintiff. He testified that plaintiff's color was bad and that plaintiff's eyes were glassy. Magdalena returned Kelley's call at approximately 11 a.m., the time that Evans' father arrived to take Demetrius home. Kelley told Magdalena that plaintiff injured his head and appeared to be sick. Magdalena instructed Kelley to take plaintiff to the hospital. Magdalena advised Kelley that she would reach the hospital from her job in approximately one hour, but that her other son would meet plaintiff at the hospital. Kelley then left the office, with a teacher's aide watching the boys, went to Otlewis and informed Otlewis of the accident and of her actions.

Between the boys' arrival at the principal's office around 10:40 a.m. and Magdalena's instructions at 11 a.m., plaintiff became nauseous. Demetrius testified that plaintiff vomited three times in the washroom across the hall from the principal's office, with him accompanying plaintiff the first two times.

At 11 a.m., Kelley telephoned the city of Chicago's "911" emergency number and stated that an injured boy needed to be taken to the hospital. The man with whom Kelley spoke took the name and address of the school and said that he would take care of it.

When assistant principal Otlewis returned to the office, she noted that plaintiff had lost color and was nodding his head up and down. Plaintiff complained of being tired and attempted to lie down on the bench. The office personnel were concerned that plaintiff had a concussion, and therefore, should not fall asleep. As a result, Kelley sat plaintiff up, washed his face, and talked to him to keep him awake.

The ambulance had not yet arrived by approximately 11:30 a.m. Otlewis told Kelley to call "911" again. Kelley identified herself and asked what had happened to the emergency vehicle. She repeated her message that an injured boy needed to be taken to the hospital. The person with whom she spoke said that the emergency system had the message and would take care of the matter.

Otlewis called "911" herself at approximately 11:45 a.m. to ask why the emergency vehicle had not yet arrived. She explained that this was the third call for emergency assistance and asked to speak directly with the fire department. The fire department dispatched an ambulance at 11:48 a.m. The ambulance reached the school only two minutes later, at 11:50 a.m., and arrived at Holy Cross Hospital only 10 minutes later, at noon.

Holy Cross Hospital is directly across the street from plaintiff's school. The ambulance that took plaintiff to Holy Cross was parked at the hospital, directly across the street from the school, when it received the dispatch.

Otlewis accompanied plaintiff to Holy Cross, arriving slightly before Magdalena. Plaintiff was transferred to Children's Memorial Hospital approximately 1 hour and 20 minutes later. Dr. Anthony Raimondi examined plaintiff at about 2 p.m. Immediately after medical tests revealed the presence of a blood clot on plaintiff's brain, Dr. Raimondi removed a subdural hematoma, about the size of an orange, from atop plaintiff's brain.

Dr. Raimondi testified that, in his medical opinion, the delay of one hour in transporting plaintiff to the hospital allowed the hematoma to grow from the size of a walnut to its size when he removed it. He further testified that had he removed the hematoma one hour earlier, plaintiff would have had merely a seven- to 10-day hospitalization. As of September 1984, six years after the accident, plaintiff's left side was severely weak, he required a cane, his intellectual function was impaired, and he experienced severe headaches. Plaintiff testified that he continues to require a cane and to experience headaches once or twice a week, that he has double vision, and that his left arm is much weaker than his right arm. The jury heard testimony also on plaintiff's mental and emotional condition.

Plaintiff filed his complaint against the board on July 19, 1979; he added the city as a defendant on December 13, 1982. The complaint sounded in negligence, alleging wilful and wanton conduct on the part of defendants. On November 17, 1983, the board filed a cross-claim against the city and filed a third-party claim against the hospital for contribution. The board later added as third-party defendants two physicians and an emergency room service. Shortly before trial, the trial court dismissed all third-party defendants on motion of the board.

After the close of plaintiff's evidence on October 29, 1984, both defendants moved for a directed verdict. They claimed that they were immune from liability for their acts or omissions; and if they

were not immune, their conduct was not wilful and wanton. The trial judge denied their motions. On November 7, 1984, the jury returned a verdict for plaintiff that awarded him $2,550,000 and that assessed half of the liability to the board and half to the city. The trial judge entered judgment thereon on the same date. Both defendants filed post-trial motions seeking either a judgment notwithstanding the verdict or a new trial, claiming that the trial judge erred in denying their motions for a directed verdict and claiming that the verdict was against the manifest weight of the evidence. The trial judge denied their motions on January 22, 1985. Defendants appeal from the judgment entered on the verdict.

I

The board asks us to reverse the verdict and enter judgment in its favor because (1) the acts of the McKay Elementary School staff were immune from liability under section 2—201 of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1983, ch. 85, par. 2—201) (hereinafter Tort Immunity Act or the Act) and (2) their acts were not wilful and wanton.

A

The board first claims that the McKay staff exercised discretion in performing the acts upon which plaintiff based this action. Therefore, the board contends, it is immune from liability for any injury resulting from those acts. Plaintiff agrees with the trial judge, who, denying the board's motions for summary judgment and a directed verdict, ruled that the acts of the McKay staff were ministerial rather than discretionary and, thus, not immune from liability.

The Tort Immunity Act protects a public employee from liability for his or her discretionary acts.

"Sec. 2—201. Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." (Ill. Rev. Stat. 1983, ch. 85, par. 2—201.)

The law grants this immunity because a good-faith mistake in judgment ought not to subject a public decision-maker to a lawsuit. Courts reason that any other rule would be a great hardship on public officials and would discourage citizens from seeking public positions. (*McCormick v. Burt* (1880), 95 Ill. 263, 266.) Further, the Act provides co-extensive immunity to the governmental employer. Ill.

Rev. Stat. 1983, ch. 85, par. 2—109.

Illinois courts have enumerated exceptions to the rule of public official immunity for discretionary acts. The board relies on *Thiele v. Kennedy* (1974), 18 Ill. App. 3d 465, 309 N.E.2d 394, and *Larson v. Darnell* (1983), 113 Ill. App. 3d 975, 448 N.E.2d 249, both from the Third Appellate District, for the proposition that immunity for discretionary acts extends to acts that a public employee undertakes in the good-faith exercise of discretion, even if his or her conduct was wilful and wanton. The only conduct to which the immunity does not extend is that based on corrupt or malicious motives. *Larson v. Darnell* (1983), 113 Ill. App. 3d 975, 977, 448 N.E.2d 249; *Thiele v. Kennedy* (1974), 18 Ill. App. 3d 465, 468, 309 N.E.2d 394.

■ We conclude that a second exception to the rule of public official immunity for discretionary acts exists; such immunity does not extend to (1) a public employee's acts based on corrupt or malicious motives, or (2) a public employee's wilful and wanton acts. In *Thiele,* on which the board relies, the court cites *McCormick v. Burt* (1880), 95 Ill. 263, an early enunciation of the discretion immunity rule, as authority for the proposition that the only exception to discretion immunity is one for acts based on corrupt or malicious motives. (*Thiele v. Kennedy* (1974), 18 Ill. App. 3d 465, 468, 309 N.E.2d 394.) However, a closer reading of *McCormick* reveals the second exception— wilful and wanton conduct. Our supreme court concluded that the complaint in *McCormick* was fatally defective, justifying the trial court's granting of defendants' demurrer, because it contained no allegation that defendants "acted *either wantonly or maliciously."* (Emphasis added.) (*McCormick v. Burt* (1880), 95 Ill. 263, 266.) The court held: "It is not enough to aver the action of such officers was erroneous, but it must be averred and proved that such action was taken in bad faith, *either wantonly or maliciously."* (Emphasis added.) *McCormick v. Burt* (1880), 95 Ill. 263, 266.

■ We agree with and follow, as we must, this conclusion. The same reasoning that prevents the applicability of discretion immunity to corrupt or malicious conduct also should prevent its applicability to wilful and wanton misconduct. Subjecting a public decision-maker to a possible lawsuit for injuries resulting from a mere mistake in judgment (simple negligence) would discourage our citizens from seeking public positions. Further, our society does not want to discourage public officials from vigorously making decisions for the good of the community. (*McCormick v. Burt* (1880), 95 Ill. 263, 266.) However, as we will discuss later, wilful and wanton conduct requires an element of intent or recklessness. Thus, our society dis-

courages public employees from displaying such conduct. See Ill. Rev. Stat. 1983, ch. 85, par. 2—202.

The appellate court for the Fifth District followed this interpretation of the discretion immunity rule in *Fustin v. Board of Education* (1968), 101 Ill. App. 2d 113, 121, 242 N.E.2d 308, 312, which we cited with approval in *Edmonson v. Chicago Board of Education* (1978), 62 Ill. App. 3d 211, 214, 379 N.E.2d 27, 30. We additionally note that in *Thiele*, Justice Stouder, concurring in the result, concluded that discretion immunity is inapplicable if a plaintiff alleges wilful and wanton misconduct. (*Thiele v. Kennedy* (1974), 18 Ill. App. 3d 465, 468, 309 N.E.2d 394 (Stouder, J., specially concurring).) Applying these principles to the case at bar, we hold that the board is not immune from liability for injuries resulting from the wilful and wanton acts of its employees.

B

The board next claims that the jury's verdict was against the manifest weight of the evidence because the acts of the McKay staff were not wilful and wanton.

■ The board invokes two defenses requiring plaintiff to prove that the McKay staff was guilty of wilful and wanton misconduct. Section 34—84a of the School Code (Ill. Rev. Stat. 1983, ch. 122, par. 34—84a) states that teachers and certified employees stand *in loco parentis* in all matters involving discipline and conduct in the schools. This relationship extends to all activities connected with a school's program and teachers or employees may exercise this authority at any time for the safety and supervision of the pupils in the absence of their parents or guardians. (Ill. Rev. Stat. 1983, ch. 122, par. 34—84a; see also Ill. Rev. Stat. 1983, ch. 122, par. 24—24.) Our supreme court has held that this section of the Code confers upon teachers and certified employees immunity from suits for negligence arising out of matters involving discipline and conduct in the schools. To impose liability against a teacher or staff member, a plaintiff must prove wilful and wanton misconduct. *Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165, 173, 347 N.E.2d 705, 709.

Further, section 2—202 of the Tort Immunity Act provides that an employee of a local governmental unit is not liable for his actions in the execution or enforcement of any law unless the misconduct is wilful and wanton. (Ill. Rev. Stat. 1983, ch. 85, par. 2—202.) The board contends that the McKay staff was implementing the board's rules and procedures in its treatment of plaintiff—rules that the

board promulgated in compliance with the legislative mandate to ensure students' safety. Ill. Rev. Stat. 1983, ch. 122, pars. 24—24, 34—84a.

■■ It is the function of the jury to resolve controverted issues of fact and to determine the credibility of witnesses and the weight, if any, of their testimony. (*Didier v. Jones* (1978), 61 Ill. App. 3d 22, 27, 377 N.E.2d 572, 575-76.) The question of whether a personal injury ahs been inflicted by wilful and wanton conduct is a question of fact for the jury to determine. *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 583, 69 N.E.2d 293, 300; *Dumpert v. Liechty* (1969), 114 Ill. App. 2d 59, 66, 251 N.E.2d 652, 656.

■■ ■ Where there is a conflict in the testimony, a reviewing court may not substitute its judgment for that of the jury in passing on the weight of the evidence and on the credibility of the witnesses. A reviewing court may not set aside a verdict merely because the jury could have determined the credibility of the witnesses differently or drawn different inferences of fact. Where credible evidence supports the verdict, the reviewing court may not say that the conclusions other than the ones drawn by the jury are more reasonable. Reviewing courts do not consider verdicts and judgments to be against the manifest weight of the evidence unless a conclusion opposite to that reached by the jury is clearly evident or the jury's verdict is palpably erroneous. "Manifest weight" is that weight which is clearly evident, plain and indisputable. (*Didier v. Jones* (1978), 61 Ill. App. 3d 22, 27, 377 N.E.2d 572.) A court of review will affirm a jury verdict unless it is contrary to the manifest weight of the evidence. *Lynch v. Board of Education* (1980), 82 Ill. 2d 415, 423, 412 N.E.2d 447, 454; *Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 83, 392 N.E.2d 628, 634.

The jury found for plaintiff on his allegations that the board's acts were wilful and wanton. Our courts have defined wilful and wanton misconduct in very many cases over the years, each case rephrasing or embellishing the wording of its predecessors. (*Hering v. Hilton* (1958), 12 Ill. 2d 559, 562, 147 N.E.2d 311, 313.) One often-quoted definition is found in *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 583, 69 N.E.2d 293, 300. There, the court said:

> "A wilful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger

through recklessness or carelessness when it could have been discovered by the exercise of ordinary care." See also *Lynch v. Board of Education* (1980), 82 Ill. 2d 415, 429, 412 N.E.2d 447, 457.

Further, courts view wilful and wanton misconduct in that area of fault between ordinary negligence and actual malice. Since this is a matter of degree, we should not attempt a hard- and thin-line definition. Although the general principle does not vary, the facts of each case always present divergent circumstances that, in most cases, are completely dissimilar. The trier of fact must closely scrutinize the facts that the evidence discloses to determine whether or not wilful and wanton misconduct exists in  given case. *Lynch v. Board of Education* (1980), 82 Ill. 2d 415, 429-30, 412 N.E.2d 447, referring to *Myers v. Krajefska* (1956), 8 Ill. 2d 322, 328-29, 134 N.E.2d 277, 280.

The board argues that the McKay staff could not reasonably know the full extent of plaintiff's injuries and that the staff followed the board's authorized procedures. The board further argues that all it could do was use the 911 emergency system, pointing to testimony at trial that board employees were not to initiate medical treatment for injuries such as plaintiff's and that any movement of plaintiff constituted medical treatment. Citing *Laflin v. Estate of Mills* (1977), 53 Ill. App. 3d 29, 35, 368 N.E.2d 522, 527, the board lastly argues that we should not review the record with hindsight and find options that existed at the time of the accident, because the McKay staff acted under the pressure of an emergency and should be judged accordingly.

Applying the above principles to the instant case, we conclude that the jury's verdict was consistent with the manifest weight of the evidence. The jury could reasonably conclude from the evidence that the McKay staff displayed reckless disregard for plaintiff's safety. Although the McKay staff did not know the full extent of plaintiff's injury, his symptoms indicated a serious illness that steadily grew worse as time progressed. Despite the board's rules that allegedly prevented the McKay staff from transporting plaintiff across the street to the hospital, the staff allowed plaintiff to walk to the washroom across the hall three times. Even if the McKay staff correctly followed board rules to the letter, the jury could conclude that, at the least, someone could have sought aid from the hospital. The jury could base this conclusion not on hindsight but, rather, on the particular circumstances of this case. These include the location of the hospital, which was directly across the street

from the school; an explicit, specific order of plaintiff's mother to take her son to the hospital; and the fact that plaintiff remained in the school office for approximately one hour before receiving medical treatment, displaying symptoms that steadily grew severe, suggesting the need for actions in addition to telephoning the 911 emergency system for nearly an hour.

## II

The city asks us to reverse the verdict and enter judgment in its favor, or order a new trial, because (1) 911 operators are immune from liability under section 4—102 of the Tort Immunity Act (Ill. Rev. Stat. 1983, ch. 85, par. 4—102), (2) plaintiff did not join a specific city employee as a defendant, (3) plaintiff did not specify the employee or employees on whose misconduct the jury assessed liability, (4) the operator's misconduct was not wilful and wanton, and (5) the trial judge improperly denied the city's motion for a mistrial due to prejudicial publicity.

## A

The city first claims that the 911 emergency system is a police protection service. Therefore, the city contends, it and its employees are immune from liability for any injuries resulting from its failure to provide such service adequately.

█ Generally, a municipality is not liable for its failure to supply police protection. (*Huey v. Town of Cicero* (1968), 41 Ill. 2d 361, 363, 243 N.E.2d 214, 216.) This common law rule of sovereign immunity is codified in section 4—102 of the Tort Immunity Act, which provides:

> "Sec. 4—102. Neither a local public entity nor a public employee is liable *** for failure to provide adequate police protection or service, failure to prevent the commission of crimes and failure to apprehend criminals." (Ill. Rev. Stat. 1983, ch. 85, par. 4—102.)

The duty of the police is to preserve the well-being of the community at large; the police generally do not owe this duty to specific individuals. This rule rests on public policy considerations and " 'embodies the conclusion that a police department's negligence—its oversights, blunders, omissions—is not the proximate or legal cause of harms committed by others.' " *Marvin v. Chicago Transit Authority* (1983), 113 Ill. App. 3d 172, 176, 446 N.E.2d 1183, 1186; *Porter v. City of Urbana* (1980), 88 Ill. App. 3d 443, 445, 410 N.E.2d 610, 612.

■■ This rule of sovereign immunity does not apply when the police have assumed a special relationship to a person that elevates her status to something more than a member of the public. (*Gardner v. Village of Chicago Ridge* (1966), 71 Ill. App. 2d 373, 378, 219 N.E.2d 147, 150; *Porter v. City of Urbana* (1980), 88 Ill. App. 3d 443, 446, 410 N.E.2d 610.) The requirements of the "special duty" exception, whereby the police owe a special duty to an individual, as opposed to the public at large, are as follows: (1) the municipality must be uniquely aware of the particular danger or risk to which plaintiff is exposed, (2) there must be allegations of specific acts or omissions on the part of the municipality, (3) the specific acts or omissions must be either affirmative or wilful in nature, and (4) the injury must occur while the plaintiff is under the direct and immediate control of employees or agents of the municipality. *Marvin v. Chicago Transit Authority* (1983), 113 Ill. App. 3d 172, 176, 446 N.E.2d 1183.

*Galuszynski v. City of Chicago* (1985), 131 Ill. App. 3d 505, 475 N.E.2d 960, recently gave the Second Division of this court an opportunity to examine the extent of the city's liability for injuries resulting from the misconduct of 911 operators. The plaintiffs in *Galuszynski* brought an action against the city, seeking damages for injuries that they suffered when armed intruders entered their home, attacked and injured them, and stole money, jewelry and other personal property. Their complaint alleged that they called the 911 system for aid, that the 911 operator improperly classified the call as a "non-emergency," resulting in the police arriving at plaintiffs' home approximately 24 minutes after they placed the call. The trial court granted the city's motion to dismiss the complaint for failure to state a cause of action, and the appellate court affirmed.

The *Galuszynski* court held that plaintiffs failed to meet the "direct and immediate control" element of the special duty exception to the Tort Immunity Act. The court reasoned that the police did not call plaintiffs into a position of peril, creating a special duty; rather, the police simply failed to provide police protection. *Galuszynski v. City of Chicago* (1985), 131 Ill. App. 3d 505, 508, 475 N.E.2d 960.

■■ In the instant case, the city argues that the 911 emergency system is a police protection service, relying on section 4–102 of the Tort Immunity Act and the case of *Galuszynski*. Plaintiff and the board agree with the trial judge, who, denying the city's motions for summary judgment and a directed verdict, ruled that the 911 system was not a police protection service.

The *Galuszynski* court expressly declined to consider the rela-

tionship between "An Act in relation to the designation of an emergency telephone number for use throughout the State" (hereinafter the 911 Act) (Ill. Rev. Stat. 1983, ch. 134, par. 31 *et seq.*) and the sovereign immunity principles surrounding section 4—102 of the Tort Immunity Act. The court stated:

> "[S]ection 15.1 of the [911 Act] provides for tort liability based upon 'wilful and wanton misconduct' on the part of police officials in operating a telephone system. However, in order to find that such liability exists, we would have to find that section 4—102 of the tort immunity act was implicitly repealed by the enactment of section 15.1 \*\*\*. Plaintiffs, however, have cited no authority for their argument. Consequently, because the repeal of a statute by implication is not favored \*\*\*, we will not make such a finding here." (*Galuszynski v. City of Chicago* (1985), 131 Ill. App. 3d 505, 509, 475 N.E.2d 960, 963.)

The *Galuszynski* court assumed that the 911 system was a police protection service. The court reasoned that its application of the 911 Act to the facts of that case would have repealed section 4—102 of the Tort Immunity Act.

We agree with the trial judge that the 911 emergency system is not a police protection service and, therefore, does not receive the tort immunity protection that section 4—102 provides. We base this conclusion on the purpose, plain meaning, and implementation of the 911 Act.

The General Assembly found that local governments maintained thousands of different emergency telephone numbers throughout the State, and that the telephone exchange boundaries and central office service areas did not necessarily correspond to public safety and political boundaries. The legislature further found that a single, three-digit number through which the public could obtain emergency services quickly and efficiently would be in the public interest. Ill. Rev Stat. 1983, ch. 134, par. 31.

To overcome the problem of local governments' overlapping jurisdictions, the legislature directed the Illinois Commerce Commission (hereinafter ICC) to establish a general plan to effectuate the purposes of the Act (Ill. Rev. Stat. 1983, ch. 134, par. 37) and to coordinate local governments' implementation of 911 systems under the Act. This coordination included assisting local governments to obtain financial help and formulate concepts, methods, and procedures that will improve the operation of 911 systems and increase cooperation between public safety agencies. (Ill. Rev. Stat. 1983, ch. 134, par.

38.) The legislature further directed the ICC to establish and review technical and operational standards for the development of the local 911 systems. (Ill. Rev. Stat. 1983, ch. 134, par. 40.) Section 15.1 of the 911 Act lastly provides that no local government or any of its officers, agents, or employees shall be liable for civil damages resulting from any act or omission in connection with operating a 911 system, except for wilful and wanton misconduct. (Ill. Rev. Stat. 1983, ch. 134, par. 45.1.) Pursuant to this mandate, the ICC adopted General Order 207, "Standards of Service Applicable to 911 Emergency Systems." 83 Ill. Admin. Code Part 725.

We agree with the appellate court for the Third District that the ICC is responsible for 911 emergency systems and not local governments. In *City of Peoria v. Illinois Commerce Com.* (1985), 132 Ill. App. 3d 835, 477 N.E.2d 749, the city of Peoria contended that the 911 Act directed the ICC only to aid local governments in their dealing with telephone companies. Peoria viewed the 911 Act as creating merely an advisory role for the ICC or that its provisions are applicable only to telephone companies. 132 Ill. App. 3d 835, 836, 477 N.E.2d 749.

After examining the whole statute, emphasizing those sections that we discussed above, the court rejected those contentions. The court reasoned that the legislature would not have created a uniform, statewide emergency telephone system without an agency to insure that the 911 systems were functioning properly once local governments established them. The court concluded that the 911 Act vested authority in the ICC to regulate the operation of local governments' 911 systems. *City of Peoria v. Illinois Commerce Com.* (1985), 132 Ill. App. 3d 835, 838-39, 477 N.E.2d 749.

Applying this reasoning to the instant case, we disagree with the city's contention that "the provision of 911 service by a police department is a police protection service, whether the particular services desired are arresting criminals, fighting fires, or provision of emergency medical services." This contention attacks the uniformity that the 911 Act seeks by contradicting the standard of liability that the Act expressly imposes on local governments and their employees.

We hold that the city's 911 system is an emergency service under the 911 Act and not a police protection service. Thus, section 4–102 of the Tort Immunity Act (Ill. Rev. Stat. 1983, ch. 85, par. 4–102) does not apply to the facts of this case; rather, the applicable standard of liability is that of wilful and wanton misconduct, found in section 15.1 of the 911 Act (Ill. Rev. Stat. 1983, ch. 134, par. 45.1).

B

■■ The city originally claimed that it cannot be liable for damages where plaintiff did not join as a defendant, or at least specify, the particular employees on whose misconduct he based his action, or show that an employee breached a duty owed to plaintiff that caused his injuries. The city subsequently conceded that our recent decision in *McCottrell v. City of Chicago* (1985), 135 Ill. App. 3d 517, 481 N.E.2d 1058, allows plaintiff to bring an action against it as long as an identified employee would be liable even though that employee is not named as a defendant in the action.

■■ The city now claims that it cannot be liable for damages where no city employee could ever be liable based on the evidence of this case. The city contends that the conduct of its employees was not wilful and wanton as a matter of law. This argument merges with the city's next claim that the jury's finding of wilful and wanton misconduct on the part of the city employees was against the manifest weight of the evidence.

We disagree. The 911 operator who took the first emergency message testified at trial. He had no recollection of the call. He testified, however, that he would not have dispatched an ambulance through the fire department based only on the information that Kelley gave. The operator testified that when a citizen called for emergency assistance, he would determine initially whether the caller needed police protection, firefighting equipment, or an ambulance. He further testified that he would ask the caller for more information if he needed it to make this determination.

The record further shows that Kelley told the operator an injured boy needed to be taken to the hospital. Kelley testified that the operator did not ask her any additional questions. Having knowledge of plaintiff's injury, the operator, through the exercise of ordinary care, could have discovered, but did not, that plaintiff required an ambulance. Referring to the definition of wilful and wanton misconduct, with its elements of recklessness or carelessness (*Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 583, 69 N.E.2d 293, 300), we cannot say that the jury's verdict was against the manifest weight of the evidence.

C

The city next claims that the trial judge abused his discretion by denying its motion for a mistrial due to a prejudicial news report.

A local television station broadcast a report on police delay in responding to 911 calls on its 10 p.m. news program. The station re-

ferred to this story in several commercials it aired during a popular weekly television drama that preceded the news. The next day, the city moved for a mistrial, claiming that the news report was prejudicial and that some of the jurors must have seen the news report, since the drama in which the news commercials aired is very popular in Chicago and, therefore, some of the jurors must have seen the commercials and watched the report. The trial judge denied the motion, stating that he had instructed the jury each day during trial to avoid information outside of the evidence, such as television and newspapers, and that he had seen the report and considered it to involve a different subject than that of the trial.

The city argues that the trial judge should have questioned the jury to determine whether any juror saw the news report and was thereby prejudiced, even though it never asked the judge to do so. A motion for mistrial due to prejudicial information outside of the evidence rests in the sound discretion of the trial court. The exercise of its discretion is subject to review and its abuse constitutes reversible error. The question for the trial judge is whether the information influenced or prejudiced any of the jurors to such an extent that they would not or could not be fair and impartial. *People v. Gambino* (1957), 12 Ill. 2d 29, 35-36, 145 N.E.2d 42, 46.

Before a court can say that outside sources of information have so influenced and prejudiced jurors, facts and circumstances must appear in the record from which a court may reasonably infer that one or more jurors had read or heard the information. The bare assertion of a defendant that one or more jurors heard the information is insufficient. (*People v. Gambino* (1957), 12 Ill. 2d 29, 36-37, 145 N.E.2d 42; *People v. Bailey* (1976), 42 Ill. App. 3d 638, 641, 356 N.E.2d 410, 412-13.) A trial judge has no duty to question a jury, *sua sponte*, unless something in the record indicates that one or more jurors had heard the information. *People v. Bailey* (1976), 42 Ill. App. 3d 638, 641-42, 356 N.E.2d 410.

In the instant case, the city makes the bare assertion that one or more jurors saw the news report. The only fact or circumstance to which it can point in support of its claim is the popularity of the television show that preceded the news. The city infers that at least one juror must have watched the show and, therefore, must have seen the commercials for the news mentioning the report and, therefore, must have watched the report on the news. This reasoning is insufficient to raise the inference that any of the jurors saw the report. Additionally, the trial judge repeatedly instructed the jury to avoid information outside of the evidence and he is entitled to

rely on the efficacy of those admonishments. (*People v. Garza* (1981), 92 Ill. App. 3d 723, 738, 415 N.E.2d 1328, 1340-41.) We hold that the trial judge did not abuse his discretion in denying the city's motion for a mistrial.

## III

■ Lastly, both the board and the city claim that the jury's apportionment of liability, half to each, was against the manifest weight of the evidence. Each defendant contends that its conduct was less culpable than that of the other.

Damages are particularly within the province of the trier of fact and a reviewing court will not disturb them on appeal unless obviously the result of passion or prejudice. (*King v. City of Chicago* (1978), 66 Ill. App. 3d 356, 359, 384 N.E.2d 22, 25.) After reviewing the record, we hold that the jury assessed the liability of defendants without passion or prejudice.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN, P.J., and McMORROW, J., concur.