**Kevin HARRELL, as the Administrator of the Estate of Patrick E. Harrell, deceased, and Dolores Harrell, Plaintiffs,**

v.

**CITY OF CHICAGO HEIGHTS, ILLINOIS, a municipal corporation, Illinois Bell Telephone Company, d/b/a Ameritech Illinois, and Ameritech Corporation, Defendants.**

No. 94 C 4961.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 1, 1996.

---

Thomas J. Nathan, Munday & Nathan, Chicago, IL, for Kevin Harrell.

Susan J. Irion, Ameritech Corporation, Chicago, IL, for Illinois Bell Telephone Company, Ameritech Corp.

Patrick J. Kilroy, Jr., Deborah Anna Golden, for Illinois Bell Telephone Company.

## MEMORANDUM OPINION AND ORDER

COAR, District Judge.

Defendant City of Chicago Heights ("City") has filed a motion for summary judgment as to Counts I, II, and III of plaintiffs' fourth amended complaint. Defendant Illinois Bell Telephone Company d/b/a Ameritech Illinois ("Ameritech") has filed a motion for summary judgment as to Counts IV and V of plaintiffs' fourth amended complaint. Ameritech has also moved for summary judgment as to the City's cross-claim against Ameritech.

### I. Factual Background

On or about May 31, 1990, the City and Ameritech entered into a contract for an enhanced 9–1–1 emergency service plan to be provided by Ameritech. Such a service plan would enable individuals residing within the City to access the City's emergency rescue services by dialing "9–1–1." *See* Ameritech's Motion for Summary Judgment, Exh. A (contract); City's 12(M) Stmt., ¶ 14. After entering into this contract, Ameritech provided the City with lists of the telephone numbers and addresses of residences located within the City's municipal borders. The City was to designate the addresses that were to receive 9–1–1 service. Ameritech's 12(M) Stmt., ¶¶ 24–31. Although plaintiffs' decedent, Patrick E. Harrell, and his wife had lived within the City's municipal borders for more than twenty years, their telephone number and residence address were not designated to receive 9–1–1 service. Ameritech's 12(M) Stmt., ¶¶ 33–34; Plaintiffs' 12(N) Stmt., ¶ 5. Neither Ameritech nor City corrected this omission, despite having actual or constructive knowledge of it. Ameritech's 12(M) Stmt., ¶¶ 38–42.

In December 1991, the City began to provide dispatching and enhanced 9–1–1 services for calls it received from residents of the City. To help finance the costs of the enhanced 9–1–1 plan, Ameritech imposed a $1 monthly surcharge on the City's residents, including plaintiffs' decedent. Despite paying the 9–1–1 monthly surcharge, plaintiffs' decedent and his wife did not receive 9–1–1 service because their residence address and telephone number had not been included in Ameritech's master list of City residents that were to receive 9–1–1 service. Plaintiffs' 12(N) Stmt., ¶¶ 3, 5. On July 11, 1993, plaintiffs' decedent suffered a coronary arrest at his home. City's 12(M) Stmt., ¶ 7. Family members of the decedent, as well as a neighbor, placed several calls to the City requesting an ambulance be dispatched to the Harrell home. City's 12(M) Stmt., ¶¶ 15–19. The City's dispatcher, however, hesitated in responding to the first of these calls while attempting to ascertain whether the Harrells lived within the City's service boundaries. City's 12(M) Stmt., ¶ 22. Though ambulances from neighboring municipalities ultimately arrived at the Harrell home and transported Patrick Harrell to the hospital, he died later that day. City's 12(M) Stmt., ¶ 30.

Plaintiffs have filed a five-count fourth amended complaint against the City and Ameritech. The City and Ameritech have filed cross-claims against each other. Counts I, II, and III of plaintiffs' fourth amended complaint are directed solely against the City. Count I is a wrongful death action; Count II is for loss of consortium; Count III is brought pursuant to 42 U.S.C. § 1983. Counts IV and V are directed solely against Ameritech. Count IV is a wrongful death action; Count V is a claim for loss of consortium. The City's motion to dismiss Count III of plaintiffs' fourth amended complaint was denied on January 29, 1996. Ameritech's motion to dismiss Counts IV and V of the plaintiffs' fourth amended complaint, as well as its motion to dismiss the City's cross-claim, was denied on February 1, 1996. After extensive discovery, the City and Ameritech have each moved for summary judgment on the underlying complaint. Ameritech has also moved for summary judgment as to the City's cross-claim.

### II. Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c); Cox v. Acme Health Serv., Inc.,* 55 F.3d 1304, 1308 (7th Cir.1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995). The movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the movant satisfies this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. *Fed. R.Civ.P. 56(e); Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552–53; *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

### III. Discussion

**A. City's Motion for Summary Judgment as to Plaintiffs' Claims**

#### 1. Count I and Count II

Count I of plaintiffs' fourth amended complaint asserts a claim for wrongful death. Count II of plaintiffs' fourth amended complaint asserts a claim for loss of consortium. In its motion for summary judgment, the City argues that Illinois' Local Governmental and Governmental Employees Tort Immunity Act, 745 *ILL.COMP.STAT.ANN. 10/1–101 et seq.* (West 1993 & Supp.1996) [hereinafter Tort Immunity Act], grants the City absolute immunity from liability under both of these counts. Specifically, the City cites § 5–101 of the Tort Immunity Act, which provides:

■ Neither a local public entity nor a public employee is liable for failure to establish a fire department *or otherwise to provide fire protection, rescue or other emergency service.*

As used in this Article, "rescue services" includes, but is not limited to, the operation of an ambulance as defined in the Emergency Medical Services (EMS) Systems Act.

*Tort Immunity Act, § 5–101* (emphasis added). Defendant argues that the highlighted language grants immunity to local public entities in regard to their failure to deliver rescue or emergency services in specific instances, while the phrase preceding that language grants immunity to local public entities in regard to their failure to establish an agency that provides such services. *See* City's Memorandum in Support of Summary Judgment, at 5 [hereinafter City's Mem.]. However, this court is not convinced that defendant's reading of § 5–101 is accurate. Both phrases must be read in light of § 5–101's title: "Establishment of fire department—fire protection—Rescue or other emergency services." *Tort Immunity Act, § 5–101* (section title). The topic of § 5–101, "establishment," indicates that the section's provisions should be read as governing a local public entity's provision of services *in general,* and not that entity's provision of services to particular individuals in specific instances. Read in this light, the first phrase of § 5–101 grants immunity to local public entities that choose not to establish their own fire departments; the second phrase refers to situations in which local public entities have also chosen not to provide for the delivery of fire, rescue, or emergency services by other means, such as contracting with neighboring public entities or private agencies. Under this interpretation, "provide" refers to the furnishing of rescue or emergency services in general, and not to the more specific idea of how or whether services are furnished to particular individuals. Thus, while it might be said that the City in this case "failed to provide" emergency services to the plaintiffs' decedent, either by not making

them part of the 9–1–1 system or by not dispatching an ambulance to their residence, that kind of "failure to provide" is not covered by the immunity provisions of § 5–101.

This interpretation comports with that of the Seventh Circuit in *Pierce v. Village of Divernon,* 17 F.3d 1074 (7th Cir.1994). In that case, the court found that § 5–101 immunizes a local public entity that "complete[ly] fail[s] to provide fire protection or other emergency services" to the public (i.e., fails to provide services in general). *Pierce,* 17 F.3d at 1077. On the other hand, the court explicitly found that, where a local public entity "fail[s] to provide sufficient 'facilities' to suppress or contain a fire," immunity is granted not by § 5–101, but by § 5–102, which provides:

> Neither a local public entity that has undertaken to provide fire protection service nor any of its employees is liable for an injury resulting from the failure to suppress or contain a fire or from the failure to provide or maintain sufficient personnel, equipment or other fire protection facilities.

*Tort Immunity Act, § 5–102; see Pierce,* 17 F.3d at 1077.

In this case, the City undertook to provide emergency services to the public at large. Once it did so, it no longer "completely failed" to provide emergency services and any subsequent actions fell outside the scope of the immunity provisions of § 5–101. Unlike fire protection services, however, there are no provisions in the Tort Immunity Act that grant tort immunity to a local public entity that has undertaken to provide rescue or emergency services to the public for injuries resulting from the failure to rescue individuals or from the failure to provide or

maintain sufficient personnel, equipment, or emergency facilities. Because § 5–101 does not grant immunity to the City for its failure to include the Harrell residence in its 9–1–1 system or for its failure expeditiously to send an ambulance to the Harrell residence, and because no other provision of the Tort Immunity Act provides such immunity, the City is not immune from liability.[1]

■ Notwithstanding this interpretation of § 5–101 of the Tort Immunity Act, the court also finds that the City's liability in relation to 9–1–1 services is more properly governed by Illinois' Emergency Telephone System Act, *50 ILL.COMP.STAT.ANN. 750/1 et seq.* (West 1993 & Supp.1996) [hereinafter 9–1–1 Act]. That Act provides in detail for the establishment and operation of 9–1–1 systems throughout the state and contains specific provisions that relate to which counties must establish 9–1–1 systems, the date by which those systems must be implemented, *see 9–1–1 Act, § 3,* the liability of various entities in relation to 9–1–1 systems, *see 9–1–1 Act, § 15.1,* the method for imposing the 9–1–1 surcharge on customers, *see 9–1–1 Act, § 15.3,* and the powers of Emergency Telephone System Boards, *see 9–1–1 Act, § 15.4.* Because of the novel nature of 9–1–1 systems and because of the specificity of the 9–1–1 Act, claims related to a local public entity's negligence in the design and implementation of its 9–1–1 system should clearly be governed by the provisions of the 9–1–1 Act. The Act provides that a municipality such as the City

> shall [not] be liable for any civil damages as a result of any act or omission, *except wilful and wanton misconduct,* in connection with developing, adopting, operating

---

1. The City's reliance on *Jackson v. Chicago Firefighters Union,* 160 Ill.App.3d 975, 112 Ill.Dec. 393, 513 N.E.2d 1002 (1st Dist.1987) is also misplaced. In that case, the court found that the Tort Immunity Act was meant to provide "blanket immunity" to firefighters for the failure to extinguish fires. In reaching that conclusion, the court relied largely on the fact that Article V of the Tort Immunity Act contains four provisions, §§ 5–101 to 5–104, that relate to immunity for various activities associated with fire protection services. The instant case, however, does not relate to fire protection services, but to 9–1–1

services. As opposed to its provisions relating to fire protection services, Article V of the Tort Immunity Act contains only one provision that arguably relates to liability for 9–1–1 services. *See Tort Immunity Act, § 5–101.* The Illinois legislature's choice not to spell out a broad scope of immunity for emergency, rescue, or 9–1–1 services in the Tort Immunity Act, as it did for fire protection services, is further evidence that the Illinois legislature did not intend to provide "blanket immunity" to local public entities in relation to 9–1–1 services.

or implementing any plan or system required by this Act.

*9–1–1 Act, § 15.1* (emphasis added). This means that the City could be liable for damages caused by willful and wanton misconduct taken by itself or its agents in regard to the failure to include the Harrell residence in the 9–1–1 system or for the failure expeditiously to dispatch rescue vehicles to the Harrell residence.

That the 9–1–1 Act's immunity provisions govern the scope of the City's liability is supported by the court's holding in *Barth by Barth v. Board of Educ.,* 141 Ill.App.3d 266, 95 Ill.Dec. 604, 490 N.E.2d 77 (1st Dist.1986). In that case, the court considered whether the provision of 9–1–1 paramedic service was a "police protection service." If so, then the immunity provisions of § 4–102 of the Tort Immunity Act would govern and the defendant City of Chicago would have been immune from suit.[2] The court in *Barth* noted that the 9–1–1 Act was meant to bring about uniformity among municipalities and other local government organizations in Illinois regarding the provisions of emergency services. *Barth,* 141 Ill.App.3d at 279–80, 95 Ill.Dec. at 612–13, 490 N.E.2d at 85–86. The court reasoned that characterizing a municipality's provision of 9–1–1 service as a police protection service so as to bring it within the absolute immunity provisions of § 4–102 of the Tort Immunity Act would defeat the purpose of the 9–1–1 Act. *Barth,* 141 Ill. App.3d at 280, 95 Ill.Dec. at 613, 490 N.E.2d at 86. Similarly, in this case defendant seeks to bring its 9–1–1 system under the provisions of § 5–101 of the Tort Immunity Act, which provides immunity for the failure "otherwise to provide ... rescue or other emergency service." *Tort Immunity Act, § 5–101.* As in *Barth,* this court finds that accepting defendant's argument would defeat the purpose of the 9–1–1 Act.

The City suggests that the court need not follow the Illinois Appellate Court's ruling in

*Barth* because of an allegedly contrary prior result by the same court in *Galuszynski v. City of Chicago,* 131 Ill.App.3d 505, 86 Ill. Dec. 581, 475 N.E.2d 960 (1st Dist.1985). In that case, a 9–1–1 dispatcher mistakenly classified a request for aid as a "non-emergency," resulting in the police arriving at plaintiffs' home approximately twenty-four minutes after the 9–1–1 call was placed. *Id.* at 506, 86 Ill.Dec. at 582, 475 N.E.2d at 961. The *Galuszynski* court assumed that the 9–1–1 system in that case was a "police protection service," and thus would receive the tort immunity protection provided by § 4–102 of the Tort Immunity Act. As in *Barth,* such an assumption would be unfounded in the instant case because the City's provision of 9–1–1 paramedic service is clearly not a "police protection service."

The City also argues, however, that the 1986 amendment to § 5–101 of the Tort Immunity Act, adding the words "rescue or other emergency service," was enacted in response to the *Barth* decision and was meant to "clarify the fact that a public entity is not liable for its failure to provide emergency rescue services." City's Reply to Plaintiffs' Response to City's Motion for Summary Judgment, at 4–5. Moreover, the City argues that at the time the causes of action arose in this case, § 15.1 of the 9–1–1 Act did not provide for liability for "units of local government," and thus the *Barth* court was mistaken in finding the defendant city liable in that case. *Id.* at 5. However, the City provides no authority for these conclusions, and the court is not convinced that the Illinois Appellate Court's holding in *Barth* should be disregarded without more compelling reasons. In addition, Illinois courts have had occasion to consider whether § 5–101 of the Tort Immunity Act provides immunity for emergency services since the 1986 amendment and have still found that the 9–1–1 Act's provisions govern over those of the Tort Immunity Act. For example, in *Shefts*

---

2. Section 4–102 provides as follows:
   Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals. This immunity is not waived by a contract for private security service, but cannot be transferred to any non-public entity or employee.
   *Tort Immunity Act, § 4–102.*

*v. City of Chicago,* 238 Ill.App.3d 37, 179 Ill.Dec. 258, 606 N.E.2d 90 (1st Dist.1992), the court found that, notwithstanding the provisions of § 5–101 of the Tort Immunity Act, the 9–1–1 Act expressly imposed a standard of liability on public agencies who operate and implement 9–1–1 systems. *Shefts,* 238 Ill.App.3d at 40, 179 Ill.Dec. at 260, 606 N.E.2d at 92.

This court concludes that the Tort Immunity Act provisions do not apply to the situation in which a local public entity has undertaken to provide 9–1–1 emergency rescue services to the public at large. The court also determines that the immunity provisions of the 9–1–1 Act govern the scope of the City's liability in regard to the design and implementation of its 9–1–1 system, making the City liable for "willful and wanton misconduct." The Illinois Supreme Court recently liberalized the standard for "willful and wanton misconduct" by stating that "wilful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care." *Ziarko v. Soo Line R.R.,* 161 Ill.2d 267, 273, 204 Ill.Dec. 178, 181, 641 N.E.2d 402, 405 (1994) (citation omitted); *see also Shefts,* 238 Ill.App.3d at 40, 179 Ill.Dec. at 260, 606 N.E.2d at 92 (stating that under the 9–1–1 Act, willful and wanton misconduct is in part defined as "reckless disregard or an utter indifference for the safety of others"). The court in *Ziarko* also stated that the determination of whether conduct was willful and wanton was fact-specific: under "the facts of one case, willful and wanton misconduct may be only degrees more than ordinary negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing." *Ziarko v. Soo Line R.R.,* 161 Ill.2d at 275–76, 204 Ill.Dec. at 182, 641 N.E.2d at 406.

Given this broad definition of willful and wanton misconduct, the court finds that there is sufficient evidence in the record for a jury to conclude that the City acted willfully and wantonly in regard to excluding the Harrells' residence from the 9–1–1 system. First of all, the wrongful exclusion of residences from the 9–1–1 system from its inception could be regarded as reckless disregard for the safety of others, given the fact that dialing the number "9–1–1" has become the primary method by which citizens summon emergency assistance. The only way citizens can normally tell whether they are in a 9–1–1 system is if they receive a 9–1–1 surcharge on their telephone bills or by dialing "9–1–1" and being unable to get a response. A jury could reasonably conclude that causing a surcharge to be placed on the Harrells' bill (and therefore causing them to believe the service was being provided) without also assuring that they were in the 9–1–1 system qualifies as reckless disregard for the safety of others because of the inherent danger that an emergency situation could arise in which the Harrells would not be able to summon assistance. More importantly, there is a question of fact as to whether the City was routinely notified by Ameritech that the Harrells were being billed for 9–1–1 service but were not receiving it. The parties dispute whether such notice was provided; however, for the purposes of this motion for summary judgment, the court will assume that the City received such "error reports" from Ameritech. A jury could reasonably conclude that, if the City did not properly investigate whether the residences listed in the error report should be included in the 9–1–1 system, the City acted with reckless disregard for the safety of others.[3] Therefore, for the above reasons, the City's motion for summary judgment as to Counts I and II is denied.

---

**3.** Furthermore, a jury might also find willful and wanton conduct on the part of the City because its dispatcher hesitated in dispatching an ambulance to the Harrell residence. *Cf. Barth,* 141 Ill.App.3d at 281, 95 Ill.Dec. at 614, 490 N.E.2d at 87 (finding willful and wanton misconduct on part of 9–1–1 operator who did not summon ambulance after having been told injured boy needed to be taken to hospital).

## 2. Count III

The City has also moved for summary judgment in respect to plaintiffs' claim in Count III that the City deprived Patrick Harrell "of his life and liberty without due process," in contravention of 42 U.S.C. § 1983. Compl., ¶ 25. Defendant puts forward three reasons for why plaintiffs cannot prevail on this claim: 1) the City did not create the dangerous situation in which Patrick Harrell was placed; 2) the City did not hinder the plaintiffs from seeking other sources of aid for Patrick Harrell; and 3) the plaintiffs cannot establish that Patrick Harrell died as a result of any City custom or policy.

As the Seventh Circuit stated in *Ross v. United States*, 910 F.2d 1422, 1428 (7th Cir. 1991), "the government's failure to provide essential services does not violate the Constitution." However, this is only a general rule. The Seventh Circuit has also held that, "[w]hen the state puts a person in danger, the Due Process Clause requires the state to protect him to the extent of ameliorating the incremental risk. When the state cuts off sources of private aid, it must provide replacement protection." *Archie v. City of Racine*, 847 F.2d 1211, 1223 (7th Cir.1988) (en banc); *see also Ross*, 910 F.2d at 1433 (stating that a fundamental tenet of the Constitution is that "the state cannot arbitrarily assert its power so as to cut short a person's life").

In this case, plaintiffs allege that there were two City policies that deprived Patrick Harrell of his life without due process. Plaintiffs' first theory is that the City had a policy of imposing the 9–1–1 surcharge on the Harrells but failing to include their residence in the 9–1–1 system. Plaintiffs' second theory is less concrete, but relates to whether the City had a policy by which dispatchers were told not to respond to emergency calls if there was a question as to whether the caller lived within the City's borders. In relation to this, the plaintiffs contend that the City's dispatcher led a neighbor and a family member to believe that City paramedics had been dispatched, when in fact those paramedics had been recalled.

■ While the plaintiffs' have gone to considerable lengths to show that one or both of these policies existed, the court finds that the plaintiffs have not met their threshold burden of establishing that the denial of 9–1–1 service to the Harrells or the failure to dispatch paramedics to their residence violated the Constitution. Following the Seventh Circuit's holding in *Ross*, this court finds that the City's failure to provide 9–1–1 service to the Harrells or its failure to send an ambulance to the Harrell residence "does not violate the Constitution.... The plaintiff[s'] allegations of municipal policy cannot surmount the main obstacle to [their] claim: the [C]ity simply had no constitutional obligation to save [Harrell's] life." *Ross*, 910 F.2d at 1428. Plaintiffs' argument that the City placed Harrell in a dangerous situation does not convince the court that the City had an obligation to save Harrell's life. While this court has recognized in section A.1, *supra*, that the City may have recklessly disregarded the danger that the Harrells might have to utilize the 9–1–1 system, that is not the same as saying that the City placed the plaintiffs' decedent in a dangerous situation. Nor is the court persuaded by the plaintiffs' other argument that the City cut off other sources of aid to the plaintiffs' decedent. The more accurate characterization of the City's actions is that it simply provided an arguably superior source of emergency aid to most of its residents and caused the Harrells to believe that they had access to this aid. This does not lead to the conclusion that the City forestalled the Harrells from seeking other sources of aid. While the City's conduct may give rise to tort liability, it does implicate due process concerns. For these reasons, the City's motion for summary judgment as to Count III is granted.

## B. Ameritech's Motion for Summary Judgment as to Plaintiffs' Claims

Count IV of plaintiffs' fourth amended complaint alleges negligence on the part of Ameritech for the wrongful death of Patrick Harrell. Count V is also directed against Ameritech and alleges loss of consortium. Ameritech puts forward three arguments as to why plaintiffs' claims against it should be dismissed: 1) Ameritech had no duty to

plaintiffs' decedent to ensure that his residence was included in the 9–1–1 system; 2) the 9–1–1 Act provides immunity from liability to Ameritech; and 3) Ameritech's tariff filed with the Illinois Commerce Commission contains an exclusion from liability.

Ameritech asserts that it is not liable in negligence to the plaintiffs because it did not owe them a duty to include the Harrells' residence in the 9–1–1 system. Ameritech's main support for this assertion lays in its argument that the City was ultimately responsible for designating the telephone subscribers who were to receive 9–1–1 service. Plaintiffs have not suggested, and this court cannot discern, any duty on the part of Ameritech arising other than under its contract with the City. Ameritech has cited to several provisions in the 9–1–1 Act that purportedly impose duties upon the City. *See, e.g., 9–1–1 Act, § 15.4(c)(2)* (providing that the Emergency Telephone System Board [which is established by the municipality implementing the 9–1–1 system] may disburse funds associated with "[t]he coding of an initial Master Street Address Guide data base, and update and maintenance thereof"); *9–1–1 Act, § 15.4(d)* ("The board shall complete the data base before implementation of the 9–1–1 system."). It is clear that the statute requires the City to establish an Emergency Telephone Systems Board, but it is unclear what oversight the City has once the board is created. Nevertheless, as between the City and Ameritech, Ameritech did not have the primary responsibility of maintaining and updating the master list of who was included in the 9–1–1 system. While the provisions of the 9–1–1 Act lead to the conclusion that the City owed a duty to the plaintiffs in this case, they do not, standing alone, indicate that Ameritech owed no duty to the plaintiffs. Therefore, in order to determine if Ameritech had a duty to the plaintiffs in this case, the court must look to the scope of duties defined by the contract between Ameritech and the City, as well as to Ameritech's tariff regarding the provision of 9–1–1 service.

▌ The City's contract with Ameritech contains several provisions that serve to define the parties' duties in regard to the installation and maintenance of the 9–1–1 sys-

tem. For example, the contract provides that the

> [City] shall have the responsibility of discovering all errors, defects and malfunctions, and assumes the duty of, and will make such tests as, in the judgment of the [City] are required to determine whether the system is functioning properly for its use. [The City] shall promptly notify [Ameritech] in the event the system is not functioning properly.

*See* Ameritech's Motion for Summary Judgment, Exh. A, ¶ 2 (contract). Again, this language says nothing of Ameritech's duties, but the language is clear that it is the City that is responsible for discovering errors in the 9–1–1 system.

In addition, the contract provides that it "is subject to all the terms and conditions of [Ameritech's] tariffs, the rules and regulations of the Illinois Commerce Commission, and all federal and state laws." *See* Ameritech's Motion for Summary Judgment, Exh. A, ¶ 4 (contract). This reference to "federal and state laws" would have put the City on notice that it had responsibilities under the 9–1–1 Act, as noted *supra.* Furthermore, the provisions of the contract put the City on notice as to the terms and conditions of Ameritech's tariff relating to 9–1–1 service. That tariff provides that

> (1) Initial and subsequent [Emergency Service Number] assignments by street name, address range and area or other mutually agreed upon routing criteria shall be furnished by the customer [i.e., the City], on paper forms supplied by the Company [i.e., Ameritech] for that purpose, to the Company, at a time mutually agreed upon between the customer and Company, prior to the effective date of service.
>
> (2) After establishment of service, it is the customer's responsibility to continue to verify the accuracy of the routing information contained in the master address file, and to advise the Company of any changes in street names, establishment of new streets, changes in address numbers used on existing streets, closing and abandonment of streets, changes in police, fire ambulance or other appropriate agencies'

jurisdiction over any address, annexations and other changes in municipal and county boundaries, incorporation of new cities or any other matter that will affect the routing of 9–1–1 calls to the proper [Public Safety Answering Point].

(3) Changes, deletions and additions which the customer desires to have made in the master address file should be submitted on an "as occurred" basis.

Ill.C.C. No. 5 Part 8—Section 3, §§ 1.2X(1)–(3). The duties that these provisions impose upon the City, along with the absence of provisions in the tariff relating to Ameritech's duty, provide the rest of the evidence needed to conclude that the City was the only party to the contract that had a duty to ensure that the addresses contained in the City's 9–1–1 system were accurate.[4] The only duties that Ameritech can be said to have had in relation to putting addresses into the 9–1–1 system are implied ones. For example, Ameritech had a duty to supply the City with accurate "paper forms," as called for in § 1.2X(1) of the tariff. Furthermore, Ameritech would have had a duty to make the corrections to the data base that the City directed it to make. Examining the record before it, the court finds that there is no genuine issue as to whether Ameritech fulfilled these duties. Therefore, because Ameritech owed no duty to the plaintiffs' decedent to ensure that his residence was included in the 9–1–1 system, and because Ameritech fulfilled all of the other duties required of it under the contract, tariff, and 9–1–1 Act, Ameritech's motion for summary

judgment as to Counts IV and V of the plaintiffs' fourth amended complaint is granted.

**C. Ameritech's Motion for Summary Judgment as to City's Cross–Claim**

Ameritech has also moved for summary judgment as to the City's cross-claim, based upon the § 1.2R indemnity provision in Ameritech's tariff.[5] While this provision might alone be enough to grant Ameritech's motion, the court finds that it need not consider this tariff provision in ruling on Ameritech's motion. As was noted in the discussion in section B, *supra*, Ameritech is only liable in tort for injuries caused in relation to the City's 9–1–1 system *if it owed a duty to the City or the plaintiff and it breached that duty.* This court has already found that the contract between Ameritech and the City imposes no duty on Ameritech to ensure the 9–1–1 data base is accurate, nor does Ameritech's tariff and the 9–1–1 Act impose such a duty. Under the contract, tariff, and 9–1–1 Act, Ameritech fulfilled any duty that it had toward the City when it supplied the City with the list of all of the telephone accounts (including the Harrells) that had addresses within the City and when it accurately inputted changes to the data base as directed by the City. In fact, Ameritech would have gone beyond its duty if it, as it alleges, generated regular "error reports" and sent them to the City. Because there is no genuine issue as to whether Ameritech fulfilled its duties toward the City and the plaintiffs', Ameritech's motion for summary judgment as to the City's cross-claim is granted.[6]

---

**4.** The record before the court also supports this conclusion. In his deposition, Captain Miller of the City's police department was asked how Ameritech would know what telephone numbers to include in the City's 9–1–1 system. He responded, "We notify them of the address." Ameritech's Motion for Summary Judgment, Exh. E, at 32 (Miller deposition).

**5.** That *section provides as follows:*

Each customer agrees to release, indemnify, defend and hold harmless the Company from any and all loss, claims, demands, suits or other action, or any liability whatsoever, whether suffered, made, instituted or asserted by the customer or by any other party or person, for any personal injury to or death of any person or persons, or for any loss, damage

or destruction of any property, whether owned by the customer or others.

Ill.C.C. No. 5 Part 8—Section 3, § 1.2R.

**6.** In any case, the terms of the contract between the City and Ameritech define the scope of Ameritech's liability. Specifically, the contract provides that

[Ameritech is] ... not liable in damages in a civil action for injuries, death or loss to person or property incurred by any person resulting from [Ameritech's] ... participation in or acts or omissions in connection with such participation in a 9–1–1 system. [Ameritech's] sole liability with regard to the provision of service under this Contract shall be governed by [Ameritech's] tariffs on file with the Illinois Commerce Commission.

### D. Supplemental Jurisdiction over Remaining State–Law Claims

 This court has dismissed Count III of plaintiffs' fourth amended complaint. Because this was the only claim over which the court had original jurisdiction, the court may decline to exercise supplemental jurisdiction over the remaining state-law claims in Counts I and II. *See* 28 U.S.C. § 1367(c)(3). In such circumstances, the general rule is that the court should relinquish jurisdiction; however, considerations of judicial economy, convenience, fairness, and comity may point to federal decision of the state-law claims. *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir.1994). In this case, the court has already ruled on two separate motions to dismiss and has expended considerable time in deciding the motions for summary judgment currently before it. Furthermore, this case is set for trial on November 4, 1996, less than two weeks from the date of this opinion. It is clear that " 'substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort.' " *Id.* (quoting *Graf v. Elgin, Joliet & E. Ry. Co.*, 790 F.2d 1341, 1347–48 (7th Cir.1986)). Therefore, the court finds that the balance of judicial economy, convenience, fairness, and comity justify retention of the state-law claims.

WHEREFORE, for the foregoing reasons, defendant City's motion for summary judgment as to Counts I and II of plaintiffs' fourth amended complaint is denied. Defendant City's motion for summary judgment as to Count III of plaintiffs' fourth amended complaint is granted. Defendant Ameritech's motion for summary judgment as to Count IV and V of plaintiffs' fourth amended complaint is granted. Ameritech's motion for summary judgment as to the City's cross-claim is also granted. Ameritech's cross-claim against the City is dismissed. This court retains supplemental jurisdiction over Counts I and II pursuant to 28 U.S.C. § 1367.

Ameritech's Motion for Summary Judgment, Exh. A (contract). In addition to this contractual provision, § 1.2R of Ameritech's tariff requires the City to indemnify Ameritech. *See supra* note 5. The City therefore understood that pursuant to the tariff and the contract, Ameritech was not liable for damages and that the City was obligated to indemnify Ameritech for Ameritech's alleged acts or omissions arising from claims of personal injury or death. This provides further support for granting Ameritech's motion for summary judgment as to the City's cross-claim.