In the
United States Court of Appeals
For the Seventh Circuit

No. 98-3135

JODIE S. ABBOTT, DAVID M. BALMES,
DEBORAH J. COMBS, et al.,

Plaintiffs-Appellees,

v.

VILLAGE OF WINTHROP HARBOR,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 93 C 4642--David H. Coar, Judge.

Argued September 14, 1999--Decided March 8, 2000

Before BAUER, ROVNER and EVANS, Circuit Judges.

Bauer, Circuit Judge.  Sixty-seven plaintiffs,
mostly current and former employees of the
Village of Winthrop Harbor police department,
sued the Village of Winthrop Harbor ("Village")
and its police chief, Kenneth Miller ("Miller"),
individually and in his official capacity as the
Chief of Police of the Winthrop Harbor Police
Department, after learning that Miller
surreptitiously recorded their personal telephone
calls made from what they believed was an
untapped line at the police department. Their
Complaint alleged violations of the Federal
Wiretap Act, the Fourth Amendment and various
pendent state law claims./1 The District Court,
after hearing evidence, found in favor of the
plaintiffs and against both defendants and
awarded the statutory damages of $10,000 per
plaintiff accorded by the Federal Wiretap Act.
The District Court, despite also finding
liability under sec.1983, declined to award
plaintiffs damages under that act. The Village
now appeals, claiming that it is not amenable to
suit under the Federal Wiretap Act and that
Miller's furtive recording of the telephone line
was done for his own personal reasons and not in
furtherance of any municipal policy which could
subject it to sec.1983 liability. We agree and
reverse the District Court's judgment against the

Village of Winthrop Harbor under both the Federal Wiretap Act and sec.1983.

I. BACKGROUND

In November, 1992, the employees of the Winthrop Harbor Police Department discovered that the (708) 746-3868 ("3868") telephone line in the department was tapped. The 3868 line was the published non-emergency administrative line for the fire and police department and the designated line for personal calls. The plaintiffs had, for several months, suspected that their calls were recorded because their police chief made comments to them about things they had only told friends and family during conversations on that line. Understandably upset over this deception and invasion of their privacy, the employees and some of their friends and family with whom they had the intercepted conversations filed suit. The question with which we are presented is whether the municipality can be liable for the surreptitious recording by its police chief. Miller was found liable by the District Court following a bench trial and he does not appeal.

In the Fall of 1991, the residents of Winthrop Harbor passed a referendum approving a tax to install a new 911 system within the Village. Under Illinois law, whenever a municipality imposes a surcharge to pay for the cost of a new (or improved) Emergency Telephone System, it must establish an Emergency Telephone System Board ("ETSB" or "Board") to plan the 911 system, implement and maintain it. 50 ILCS 750/15.4. The Board's powers and duties also include the hiring of persons to install, maintain and upgrade the system, the authorizing of expenditures and the filing of all necessary applications with the Illinois Commerce Commission ("ICC"). One of the Board members testified at trial that the purpose of submitting paperwork to the ICC was to identify "all the content of the system, what the intent of the system was for, what lines were to be used on it, what lines were not going to be used on it."

Chief Miller was appointed by the mayor to head Winthrop Harbor's ETSB and he was thus intimately familiar with the decisions of the Board and the new system as planned. The most prominent feature of the new 911 system was the recording of the previously unrecorded police department telephone lines and radio frequencies.

The ETSB chose Ameritech and Lanier World Wide ("Lanier") to install and maintain the 911 system. The Lanier recorder purchased by the Village was a reel-to-reel continuous recording 10-track recording device, with a tape that ran

for just over 25 hours. Three 911 lines, the 2131, 2133, 2140 non-emergency telephone lines and four radio channels were connected to it.[2] The only line that was not connected to the recorder was the 3868 line.[3] The Board deliberately decided that that line would remain unrecorded because it was the line used by employees for personal calls.

The ETSB verified with the Ameritech installers following the connection that the 911 system was set up in this way, in accordance with the 911 application submitted to the ICC. They were assured by the installers that it was. The ETSB, in accordance with reporting procedures, informed the Village board of trustees that the system was set up and functioning in this manner.

On September 27, 1991, Miller issued a memorandum to all police department employees which stated in part: "911 is now on line, all phones except 746-3868 are being recorded and all radios are being recorded. When placing a phone call that is police related it will be done on a recorded line." Miller testified at trial that he intended this memo to inform employees that "nonpolice related things would be on an unrecorded line." In other words, he wanted personal calls made on the 3868 line.

Eleven months later, in August, 1992, Chief Miller had a contractor connect the 3868 line to the Lanier recorder. He had it done in a secretive manner, avoiding the use of the Lanier representative who made all of the service repairs to the system and asking the independent contractor who performed the hook-up not to tell anyone what he had done. Furthermore, Miller did not ask to have an audible beep put on the line so that callers would know that the line was being recorded and none was put on.

The decision to connect the 3868 line to the 911 system was made without the knowledge or consent of the ETSB, the mayor and the Village trustees, and they never found out about the recording because neither Miller nor his contractor ever submitted a bill for the work. Indeed, the only persons that Miller told about the recording of the 3868 line were Telecommunications Supervisor Ortiz and Deputy Chief Commons. Ms. Ortiz was instructed by Miller that she should listen to conversations recorded on the 3868 if she thought they might be "of interest" to him.

During the next three months, Ortiz made a tape of a call made by plaintiff Jodie Abbott and gave

it to Miller. She also transcribed other conversations for him. On occasion, Miller would make remarks to his employees about the substance of the recorded conversations. When asked where he got his information, on one occasion, Miller replied that "a little bird" told him.

The secret recordings continued for three months until the department employees learned from a Lanier service representative that the line was tapped. Even then, the recording continued. The 3868 line was not disconnected from the Lanier recorder until May, 1993, when Miller learned of a lawsuit in McHenry County regarding the recording of a phone line without notice.

Miller testified that as police chief he believed he was the person with decision-making authority regarding the telephone system. He stated that one of the reasons why he tapped the 3868 line was because he was concerned that employees spent too much time away from work on the phone. He also claimed to be concerned about the long distance personal calls being made by employees. The District Court found these reasons to be pretextual and not within the protective ambit of the Federal Wiretap Act's law enforcement exemption as the recording was not done in the ordinary course of police business. Indeed, the District Court made a specific finding that Miller's motivation was personal, "to intercept the private calls of his employees." Statutory damages of $10,000 per plaintiff were awarded, along with attorneys' fees and costs.

In concluding that the Village was also liable under sec.1983, the District Court noted that the decision to connect the 3868 line to the 911 system was a matter that affected the "internal operation" of the police department, and pursuant to local ordinance the police chief was allowed to make rules and regulations that affected the internal operation of the police department. Therefore, the Court reasoned, because he, and not someone else within the Village, had the final policy-making authority on decisions about whether to record police lines, his actions subjected the Village to liability. No additional damages were awarded to the plaintiffs for the sec.1983 violation.

II.  DISCUSSION

This case was tried, without a jury, to the District Court. We review the District Court's conclusions of law de novo. Eyler v. C.I.R., 88 F.3d 445, 448 (7th Cir. 1996). Factual determinations, as well as the application of legal principles to those factual determinations,

are reviewed for clear error. Estate of Whittle v. C.I.R, 994 F.2d 379, 381 (7th Cir. 1993); Business Records Corp. v. Lueth, 981 F.2d 957, 959 (7th Cir. 1992).

A.  The Federal Wiretap Act

Congress enacted the Federal Wiretap Act "for the dual purpose of protecting the privacy of wire and oral communications, and delineating the conditions under which such communications may be intercepted." Jandak v. Village of Brookfield, 520 F.Supp. 815, 819 (N.D. Ill. 1981) (citing S. Rep. No. 1097, 90th Cong., 2d Sess. (1968)). The Village, found liable for Miller's secret tape recording, challenges the judgment against it, arguing that the Act is inapplicable to municipalities. The plain language of the statute bears that out.

The Act provides that "any person who--(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral or electronic communication" shall be found in violation of the statute and subject to civil or criminal penalties. 18 U.S.C. sec.2511(1)(a). "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust or corporation." 18 U.S.C. sec.2510(6). As written, the statute does not include a municipality within its definition of "person." Absent a clearly expressed legislative intent to the contrary, the statutory language must be regarded as conclusive. Milwaukee Gun Club v. Schulz, 979 F.2d 1252, 1255 (7th Cir. 1992) (citation omitted).

Plaintiffs argue that the Act's specific provision for recovery of civil damages against any "person or entity" who violates the Act is contrary proof that Congress intended to subject municipalities to liability. See 18 U.S.C. sec.2520(a). As enacted in 1968, the Act authorized recovery of civil damages only against a "person" and made no mention of an "entity." In 1986, however, Congress amended portions of the Act, and inserted "entity" into sec.2520. Plaintiffs believe this means that Congress now intends for governmental units to be liable to those whose wire, oral or electronic communication are wrongly intercepted. We disagree.

The legislative history is silent as to the reason behind the addition of the term "entity" in sec.2520(a). As the court in Amati v. City of

Woodstock, 829 F.Supp. 998 (N.D. Ill. 1993) concluded, "[i]t is unreasonable to conclude that Congress intended to subject an entire class of defendants to potential liability without any expression of that intent in the legislative commentary." Id. at page 1003. In an excellent discussion of the history of the Federal Wiretap Act, the Amati court also recounts the numerous proofs that Congress intended to exclude governmental entities from those subject to liability under the Act. Id. at 1001-03. We, too, are persuaded that municipalities are immune from suit, not only because of the corroborating testimony in the legislative history, but simply because Congress has never amended the definition of "person" in sec.2510(6). That definition unequivocally excludes local governmental entities from its definition of person and continues to apply to the entire chapter.

Contrary to plaintiffs' assertions, our holding in Davis v. Zirkelbach, 149 F.3d 614 (7th Cir. 1998), does not create a cause of action against municipalities under the Federal Wiretap Act. In that case, we did not reach the question of whether governmental entities come within the ambit of entity liability in sec.2520 because we found that the plaintiff had presented no evidence "that the City had a policy or practice of unlawfully using intercepted communications in violation of the Federal Wiretap Act . . . or sec.1983," a prerequisite to a finding of liability under either statute. Id. at 621. Since there was no evidence for us to consider, we did not decide, implicitly or explicitly, whether municipalities were amenable to suit under the Federal Wiretap Act.


B.   Section 1983

The plaintiffs contend that the interception of their phone calls violated their Fourth Amendment rights, giving rise to a cause of action under sec.1983. The Fourth Amendment guarantees citizens the right to be free from unreasonable search and seizure. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Village argues that it did nothing to deprive the plaintiffs of any federally protected right and therefore it cannot be civilly liable to them. Winthrop Harbor maintains that it was Miller's departure from its policies, not the policies themselves, that caused plaintiffs' harm.

In order to find a municipality liable under sec.1983, the plaintiffs must prove that a municipal policy or custom caused their injury. City of St. Louis v. Praprotnik, 485 U.S. 112,

108 S.Ct. 915, 99 L.Ed.2d 107 (1988); Pembaur v. Cincinnati, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 1298-99, 89 L.Ed.2d 452 (1986). This is because "[m]unicipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents." Auriemma v. Rice, 957 F.2d 397, 399 (7th Cir. 1992), quoting Monell v. New York Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Following these principles, we must decide whether the plaintiffs' injury was inflicted solely by Chief Miller, or whether the harm was done pursuant to some municipal policy or custom, keeping in mind that "a local government may not be sued under sec.1983 for an injury afflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under sec.1983." Monell, 436 U.S. at 693.

Courts have identified three ways in which a municipality can be liable to a plaintiff for a civil rights violation resulting from government policy:

(1)  an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

Baxter v. Vigo County School Corp., 26 F.3d 728, 735 (7th Cir. 1994) (internal quotations and citations omitted). Plaintiffs here must, then, demonstrate either that it was the official, written policy of the government to violate employees' privacy, that it was a widely accepted and known custom of the Village to listen in on its employees' private conversations, or that Chief Miller had the final authority to decide whether to furtively record employees' telephone calls without notice to the callers.

We do not see any evidence in the record before us that it was the policy of the Village of Winthrop Harbor to secretly record employees' telephone conversations. Nor do we find that there was a widespread practice or pervasive pattern of such conduct. Thus, we turn our attention to the question of whether Miller had the final policymaking authority for the decision to connect the 3868 line to the 911 system's

recorder so as to subject the Village to sec.1983 liability. We begin by noting that whether Miller was a person with final policymaking authority is a question of state law. Pembaur, 475 U.S. at 483.

The Village argues that the final policymaking authority regarding the 3868 line belonged to the ETSB, not Miller. They note that pursuant to law, an Emergency Telephone System Board must be established to plan the new emergency telephone system. 50 ILCS 750/15.4. The Illinois legislature charges the ETSB with the responsibility of "planning" the system, "coordinating and supervising the implementation, upgrading or maintenance of the system," "receiving monies from the surcharge or tax," "authorizing all disbursements from the fund" and "hiring" any persons necessary to install or maintain the system. 50 ILCS 750/15.4(1)-(5). This is a very broad grant of authority which seems to encompass all facets of the Village's 911 system.

Nonetheless, the District Court determined that Miller had final policymaking authority to connect the 3868 line into the 911 system. Relying on a local ordinance which gives the police chief the authority to "make or describe such rules and regulations for the internal operation of the police department as he sees fit and proper," the Judge found that the decision to connect the 3868 line to the 911 recording system affected the internal operation of the police department, and was not something that the chief needed to have approved by other Village authorities. The Court cited as support the fact that on neither occasion, either when connecting or disconnecting the 3868 line to the 911 recorder, did Miller seek the Board's approval. The Judge also was persuaded by Miller's testimony that, pursuant to his authority to run the police department, he made decisions on all matters except personnel and the budget.

These facts, however, have little to do with where the law places the authority for the decision. "[A] federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." Praprotnik, 485 U.S. at 126. Here, the Illinois legislature has placed the final policymaking authority with the ETSB, not with the police chief. 50 ILCS 750/15.4. Also, the Illinois courts have held that a municipality's 911 system is an emergency service, not a police protection service. Barth by Barth v. Board of Education, 141 Ill.App.3d 266, 279-280, 490 N.E.2d 77, 85-86, 95 Ill.Dec. 604, 612-613 (1st Dist. 1986); City of Peoria v.

Illinois Commerce Commission, 132 Ill.App.3d 835, 838-39, 477 N.E.2d 749, 751, 87 Ill.Dec. 623, 625 (3rd Dist. 1985). Thus, consistent with these authorities, we find that the final policymaking authority to authorize the connection of a telephone line to the 911 system rested with the ETSB and not the police chief. Although the police chief may have sweeping powers to conduct his department as he sees fit, those powers are limited, in this case by the Illinois Commerce Commission's and the ETSB's authority to regulate the content of Winthrop Harbor's 911 emergency system. Once Miller connected the 3868 line to the recorder, it became part of the 911 system and under the control of the ETSB.

This finding is buttressed by the fact that the ETSB was required to, and did, fill out paperwork identifying the content of the system, its purpose, what lines were a part of it and what equipment was to be used, and submitted it to the ICC for approval. Any alteration to the 911 system would have required an amendment to the Village's application. Thus, we are convinced that it was the ETSB, and not Miller, who was authorized to establish the Village's policy with regard to the recording of the 3868 line. The Village chose not to record the line. Miller's actions frustrated rather than implemented that policy.

Finally, we note that the District Court specifically found that Miller's purpose for taping the 3868 line was "not related to the ordinary course of police business," and that his primary motivation was "to intercept the private calls of his employees." In other words, the District Court believed that Miller's actions were done for personal reasons. This conclusion, that Miller was implementing no policy other than his own, ensures victory for the Village.

III. CONCLUSION

For the foregoing reasons, the judgment of the District Court is reversed and this cause is remanded to the District Court with instructions to enter judgment in favor of the Village of Winthrop Harbor and against the plaintiffs on both the Federal Wiretap Act count and the Section 1983 count.

REVERSED.

/1 Only the claims under the Federal Wiretap Act, 18 U.S.C. sec.2510 et seq., and the claims under the Civil Rights Act of 1871, 42 U.S.C. sec.1983, for the Fourth Amendment violations are at issue here.

/2 All of the recorded telephone lines had a beep
tone on them to signal callers that the lines
were being recorded. However, no beep tone was
put on the recorded radio channels.

/3 This is consistent with the paperwork submitted
by the ETSB to the ICC which showed that the 3868
line was supposed to be unrecorded.