In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-3427

NICHOLAS NARDUCCI,

*Plaintiff-Appellee,*

*v.*

GREGORY MOORE and DONALD LEMM,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1425—**Milton I. Shadur**, *Judge.*

ARGUED MAY 7, 2009—DECIDED JULY 9, 2009

Before FLAUM and WILLIAMS, *Circuit Judges*, and
LAWRENCE, *District Judge.**

FLAUM, *Circuit Judge*. Nicholas Narducci, at one time
the comptroller for the Village of Bellwood, is suing

* The Honorable William T. Lawrence, United States District
Court Judge for the Southern District of Indiana, sitting by
designation.

the Village, the former mayor, and the police chief for violating his Fourth Amendment rights and the Fourth Amendment rights of other plaintiffs in this class action suit by surreptitiously recording phone calls from the village's finance department. He is suing under 42 U.S.C. § 1983 and Title III, a federal statute prohibiting government officials from intercepting wire or electronic communications. The defendants moved for summary judgment in the district court, which was granted in part and denied in part. They now appeal the denial of summary judgment, arguing that they are entitled to qualified immunity on both the § 1983 and Title III claims.

For the following reasons, we affirm the district court.

## I.  Background

In 1993, Joe Lagen, the comptroller of the Village of Bellwood, began to worry about irate residents threatening employees of the village's finance depart-ment over the phone (usually because the residents had failed to pay their utility bills and had seen the city shut off their water service). And that was not Lagen's only worry. He was also concerned about finance depart-ment employees making personal calls on the village's time and over the village's phone lines. Lagen proposed to the village's board of trustees at a "pre-board" meeting that the village record calls to and from the finance de-partment on the same system used to record calls to the police and fire departments.

"Pre-board" meetings, which were usually attended by Bellwood's mayor (Donald Lemm), the board of trustees,

the village attorney and the village clerk, were a common means by which the board of trustees clarified its agenda in advance of the twice-monthly board meetings and heard proposals; it was unusual, but not unheard of, for the board to adopt policy at a "pre-board" meeting. The board of trustees apparently agreed to Lagen's proposal at the meeting, and authorized him to begin recording the finance department telephone lines. Lemm supported the idea as well, having recently heard some complaints about finance department employees being rude to residents calling the village.

The board requested that the Bellwood Emergency Telephone System Board, the board overseeing the village's 911 operations, connect the finance department phone lines to the recording system for emergency calls. Bellwood established an emergency telephone system in 1990 and the police department recorded calls to the system. Lagen sent Gary Modrow, a sergeant in the local police force and the chair of the Emergency Telephone System Board, a memo on January 4, 1994, instructing him to add five phone lines from the finance department to the emergency recording system. Modrow asked a technician from Dictaphone, the manufacturer of the village's recording system, to connect those phone lines. The process was completed about thirty days later. Narducci contends that the village did not post notices on or near the phones alerting finance department em-

ployees that the village was recording their phone calls.[1] The village claims, however, that users of the phone system heard an audible beep when they began using one of the recorded lines. Narducci, citing deposition testimony from Modrow, counters that the beep tone was eliminated and that he, at least, never heard it when using the affected phone lines. It appears that Lagen never listened to any of the calls to check up on threats to department employees or misuse of the village's phone system, and Lemm never followed-up with the finance department regarding threats from customers or instances of rude behavior from employees.

In March 1996, Gregory Moore replaced Robert Frascone as the chief of the village's police department. Moore learned before taking office that the village was recording phone lines in the finance department, but did not investigate the circumstances of the recording and took no steps to disconnect the Dictaphone from the phone lines until Narducci, Lagen's successor as comptroller, asked him to. Moore argued in the district court that he had no authority to disconnect the phone lines, although Frascone and Lemm claimed in deposition testimony that he did.

---

[1] For his part, Lagen claimed in deposition testimony that he gave a memo to the affected employees letting them know that the village had begun recording the phone lines in the department and that he discussed this with them in face-to-face meetings. Because the case is before us on appeal from a motion for summary judgment, we take the facts in the light most favorable to Narducci.

Narducci took over as Bellwood's comptroller in 1997 or 1998, replacing Lagen. He says that when he took over he had no idea that Bellwood was recording the phone lines in his department. Bellwood is a small unincorporated community just west of Chicago, and does not employ a full-time comptroller; Narducci was simultaneously working for other nearby communities and usually spent only a few days a week in Bellwood. When he was in Bellwood, he frequently used the phone lines in the finance department both for Bellwood-related calls and also to make calls related to confidential matters for other cities. Narducci claims that he would usually work at whatever desk in the finance department was open, but that for confidential matters he sought a less-crowded place to make his calls.

Narducci learned that Bellwood was recording the phone lines in the finance department in a meeting on February 28, 2000. Narducci notified two trustees of the village that he thought the taping was illegal, alerted the FBI and the state's attorney, and wrote a memo to Moore directing him to stop the recording. After sending that memo, Narducci continued to make phone calls on the finance department phone lines but used his cell phone for all confidential calls.

Moore instructed Modrow to disconnect the finance department phone lines from the Dictaphone recorder. Moore believed that the phone lines were disconnected in March 2000. Modrow, on the other hand, said that he believed the phones were still connected when he left Bellwood in February 2002.

In February 2001, Narducci filed a lawsuit against the Village of Bellwood, Moore, Lemm, and various unknown trustees and employees of the village. He later dismissed the claims against the unnamed trustees and employees, but proceeded with the case against the three named defendants, and later had his suit certified as a class action on behalf of other employees of the finance department whose phone calls were recorded. The suit brought claims under 42 U.S.C. § 1983 and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 for, respectively, violating his Fourth Amendment right not to be subjected to illegal searches and for illegal wiretapping. He also brought Illinois state law claims under the Eavesdropping Act and a tort action for intruding on a place of seclusion. Lemm and Moore moved for summary judgment on all claims, and specifically on the ground of qualified immunity (although as we will see, there's a complicated back story to their qualified immunity claim on the Title III count). The district court granted summary judgment on the state law claims and on any Title III claims involving phone calls made after Narducci learned about the recording in February 2000. The district court denied summary judgment on the § 1983 claims and the remaining Title III claims, finding that there were disputed issues of fact and that the defendants were not entitled to qualified immunity. Lemm and Moore now appeal the district court's denial of their qualified immunity claims.

## II. Discussion

We review a district court's summary judgment decision de novo. *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009). Summary judgment is proper where "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The defendants are appealing from the district court's denial of qualified immunity. The doctrine of qualified immunity protects government officials from lawsuits for damages when their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to provide reasonable notice to government officials that certain conduct violates constitutional rights before a plaintiff can subject them to liability. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Reasonable notice does not require that there be a case "fundamentally similar" to the present case, and indeed an officer can be on notice that his conduct violates constitutional rights even in novel factual circumstances. *Id.* at 741 ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts."). For a right to be clearly established, "its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . in the light of

pre-existing law the unlawfulness must be apparent.' " *Id.* at 739 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

When examining a qualified immunity claim, a court examines whether a constitutional right has been violated; and then, if a constitutional right was violated, whether the right in question was sufficiently well established that a reasonable officer would have been aware of it. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). We no longer need to address the two portions of the qualified immunity analysis in any specific order, and can frame our discussion in the way that produces the clearest decision. *See Pearson v. Callahan*, 129 S. Ct. 808, 821 (2009). Here, because defendants argue that Narducci's Fourth Amendment rights were not violated and that the violation of this right was not "clearly established," we will consider both issues in turn.

## A. Fourth Amendment violation

Lemm and Moore first argue that Narducci's § 1983 suit fails because he did not establish a violation of his Fourth Amendment rights. 42 U.S.C. § 1983 is not an independent source of tort liability; instead, it creates a cause of action for "the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997). The statute is thus a means of vindicating rights secured elsewhere. *Id.*

The underlying claim in this case is a Fourth Amendment claim. "The touchstone of Fourth Amendment inquiry is reasonableness, a standard measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest." *Green v. Butler*, 420 F.3d 689, 694 (7th Cir. 2005).

The Supreme Court has held that the Fourth Amendment applies to "searches and seizures by government employers or supervisors of the private property of their employees." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987). With respect to the scope of Fourth Amendment rights in the workplace, however, the Court added that "[t]he operational realities of the workplace . . . may make *some* employees' expectations of privacy unreasonable." *Id.* at 717. Practices and procedures of a particular office or legitimate regulations may reduce the expectation of privacy that government employees enjoy in their workplace. *Id.* The circumstances of a particular case matter a great deal, and each Fourth Amendment claim in this context has to be examined on its own. "Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *Id.* at 718.

Once an employee demonstrates a reasonable expectation of privacy, he must then demonstrate that the search was unreasonable. "[P]ublic employer intrusions on the constitutionally protected privacy interests of

government employees for non-investigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances." *Id*. at 725-26. This standard has two requirements: First, the search must have been "justified at its inception," and second, it must have been "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 726.

We first consider whether Narducci had a reasonable expectation of privacy in his phone line. Lemm and Moore argue that he did not, for two reasons. First, they argue that Narducci did not have a reasonable expectation of privacy in a phone line in the finance department; second, they contend that there was never a "search" within the meaning of the Fourth Amendment because nobody ever listened to the calls.

The district court, citing *Katz v. United States*, 389 U.S. 347, 353 (1967), another case involving surreptitious recording of phone calls, found that Narducci enjoyed a reasonable expectation of privacy in his phone line. Lemm and Moore argue that the issue is more precise, and that in this case the search was only unreasonable if Narducci had a reasonable expectation of privacy when talking on a phone line at work. According to the defendants, Narducci could not have had a reasonable expectation of privacy when talking on a phone line in a crowded workplace, since anyone working nearby could easily overhear his conversations. Additionally, they cite Modrow's deposition testimony that the recording

system emitted an audible beep at the beginning of every phone call, which should have led users of the system to conclude that their calls were recorded. The existence of that beep, and what indication it gave to finance department employees about the privacy of their phone calls, is disputed; taking the facts in the light most favorable to Narducci as the non-moving party, it is not a basis for summary judgment. If the recording procedures were as obvious as Lemm and Moore now claim that they were, then the jury may well conclude that Narducci did not have a subjective expectation of privacy in his phone line. That is a factual dispute that the jury will need to resolve, however.

Nor can this court take at face value Lemm and Moore's claim that Narducci could not have expected his phone calls to remain private in a crowded work area. Narducci claimed in his deposition testimony that when discussing a confidential matter he "went to a phone where there wasn't a lot of people working nearby." If true, this would be sufficient for the jury to conclude that Narducci had a subjective expectation of privacy when using one of the village phone lines.

Lemm and Moore also argue, however, that even if Narducci had a subjective expectation of privacy it was not an objectively reasonable one. Their contention is that society would not recognize a reasonable expectation of privacy in a phone line provided by the Village of Bellwood for public purposes. Under their theory, the need to monitor the efficient provision of public services militates against an expectation of privacy on such a

phone line. This broad exclusion is in tension with language from the *Ortega* opinion rejecting such a categorical approach to workplace privacy rights. *See Ortega*, 480 U.S. at 717 ("Given the societal expectations of privacy in one's place of work expressed in both *Oliver* and *Mancusi*, we reject the contention made by the Solicitor General and petitioners that public employees can never have a reasonable expectation of privacy in their place of work."). As the Court found in *Ortega*, the idea that one could conduct confidential business at work, and have an expectation of privacy when doing so, is not per se unreasonable.

Lemm and Moore also argue that there was no "search" here within the meaning of the Fourth Amendment because, while the calls were recorded, there was no evidence that anyone ever listened to them. Their claim here is that if nobody ever learned about the contents of the phone calls then nobody did anything that could have run afoul of the Fourth Amendment. Narducci argues that we cannot credit this claim at summary judgment because there is a factual dispute about whether anyone listened to the phone calls. Narducci has not come forward with any evidence that anyone listened to the calls, and is really alluding to the possibility of a factual dispute more than anything else.[2] Never

---

[2] The defendant's Local Rule 56.1 statement contains two paragraphs relevant to this dispute. One paragraph states that Lagen never listened to any of the recordings, and neither

(continued...)

theless, this is not a proper ground for summary judgment. The defendants ask us to infer from the absence of evidence in the record that nobody from the Village of Bellwood ever listened to the recorded phone calls, but drawing that inference would be incompatible with the requirement that we draw all reasonable inferences in favor of the non-moving party.

Taking the facts in the light most favorable to Narducci, then, he has demonstrated a reasonable expectation of privacy in his phone line at work. The next issue is whether the workplace search in this case was conducted in a reasonable manner. In *Ortega*, the Court rejected a warrant or probable cause requirement for workplace searches and instead determined that those searches must simply be reasonable under all of the circumstances. *Id.* at 721-25. "Under this reasonableness standard, both the inception and the scope of the intrusion must be reasonable." *Id.* at 726. A search by a superior is justified at its inception "when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose . . . ." *Id.* The

---

[2] (...continued)
did anyone else in the finance department, while a second paragraph states that no one was assigned to monitor the calls. While these statements suggest that nobody listened to the calls as a matter of course, it would take an inferential leap for us to accept the defendants' argument that nobody *ever* listened to the calls.

search is reasonable in scope so long as "the measures taken by the employer are reasonably related to the search's objective and they are not overly intrusive in light of the nature of the alleged misconduct." *Gossmeyer v. McDonald*, 128 F.3d 481, 491 (7th Cir. 1997). The district court found that the search was justified at its inception because it was motivated by a work-related need to record instances of customers being abusive to employees (or vice versa) and to monitor the use of village phone lines for personal calls. It ultimately concluded, however, that under Narducci's version of the facts that recording every single phone call made on those lines for years without ever notifying the employees was not a reasonable scope for the search.

Lemm and Moore argue that the district court erred by finding that the search was unreasonably expansive; they claim that the parameters of the search were never broadened, and so if it was reasonable at its inception it was reasonable throughout its duration. This argument ignores the excessive duration of the search in this case, however. The recording here lasted at least six years (and perhaps longer, given the discrepancy in testimony about when the phone lines were disconnected); Narducci worked for Bellwood for approximately two years before he learned that the phone lines were recorded. He testified that he made "hundreds and hundreds" of phone calls, some involving "sensitive personal matters" that were all recorded on the village's Dictaphone system. Narducci testified that all of this was done without giving any notice to the affected parties. *Ortega* necessarily requires a case-by-case inquiry, and

we need not go beyond the facts of this case when dis-
cussing the Fourth Amendment's applicability. Given
that the allegations in this case include the recording
of every phone call, for at least a six-year period, with no
notice to the affected employees and with the invasion
of privacy falling particularly hard on finance depart-
ment employees who used those lines every day, Narducci
has presented sufficient evidence of a violation of the
Fourth Amendment to withstand summary judgment.[3]

## B. Whether the right was clearly established

Lemm and Moore also argue that workplace search
and seizure law was not sufficiently developed at the
time of the taping to put them on notice that their
conduct violated constitutional rights. This circuit's case

---

[3] We emphasize that our ruling here is centered on the fre-
quency with which Narducci used the affected phone lines, the
volume of calls that he made, as well as the lack of notice. The
district court has certified this case as a class action, with the
class including all persons who called into or out from the
phone lines during the duration of the taping. Because of the
sensitive, case-by-case inquiry of *Ortega* (including its limita-
tion to government employees, which some members of the
purported class are almost certainly not) we are skeptical that
Narducci's claims are typical of the claims of the entire class
(which theoretically embraces people who made a single
phone call) and suggest that in light of the limited nature of
our ruling the district court may need to revisit the issue of
class action certification pursuant to Federal Rule of Civil
Procedure 23(c)(1)(C).

law, they argue, remains relatively undeveloped on the subject of workplace searches and seizures. There have only been two decisions in this circuit dealing with the issue, both involving physical searches. In *Shields v. Burge*, 874 F.2d 1201, 1204-05 (7th Cir. 1988), we held that officials who searched a police officer's desk and a briefcase found in his car were immune from suit under § 1983 because the search did not violate a clearly established right. In *Gossmeyer v. McDonald*, 128 F.3d 481, 491 (7th Cir. 1997), we held that a similar search of a Child Protective Services employee's file cabinet was reasonably related to allegations of workplace misconduct and reasonable in scope. Moreover, the panel found that all of the officials executing the search were entitled to qualified immunity. *Id.* at 495. There is thus no square holding addressing whether recording an employee's phone calls violates his Fourth Amendment rights, and only two opinions addressing the outlines of Fourth Amendment rights in the workplace.[4]

---

[4] Lemm and Moore also cite *Amati v. City of Woodstock*, 176 F.3d 952 (7th Cir. 1999) and *Abbott v. Village of Winthrop Harbor*, 205 F.3d 976 (7th Cir. 2000). Neither case supports their qualified immunity claim on the Fourth Amendment grounds. *Amati* considered only claims brought under Title III, and it involved the recording of phone calls into and out of a police department, which obviously involves different justifications than recording calls into and out of a non-emergency city department. *Abbott* involved both § 1983 claims and Title III claims, but the opinion is concerned with questions of municipal liability rather than the scope of Fourth Amendment rights.

Narducci does not contend that there is a decision from this circuit or the Supreme Court addressing this issue, but he argues that the contours of the right were sufficiently clear. Both *Katz* and *Ortega* preceded Bellwood's decision to record the phone lines in the finance department; Lemm and Moore thus should have known that recording those phone lines was a violation of constitutional rights. While *Gossmeyer* and *Shields* both permitted workplace searches and found qualified immunity, neither decision altered the analysis courts are supposed to apply to such claims and thus did not blur the lines drawn by *Ortega* and *Katz*. Indeed, the opinion in *Shields* noted that a search may not be reasonable if it was a "fishing expedition conducted with the *hope* that something would turn up." *Shields*, 874 F.2d at 1205 (emphasis in original).

The district court's summary judgment opinion, for its part, did not find a case in this circuit holding that this conduct or similar conduct violated a public employee's Fourth Amendment rights. The district court denied qualified immunity, however, because it found that no reasonable official could have believed that the indiscriminate taping of all phone calls, with no notice to the affected employees, for several years after the complaints and alleged threats had ceased, was reasonably related to the problem justifying the search. The defendants point out that there is no opinion explicitly finding such conduct to be a violation of the Fourth Amendment, but the Supreme Court only requires that "the unlawfulness must be apparent" in light of the caselaw. *Shields*, 874 F.2d at 1205 (quoting *Anderson*, 483

U.S. at 640); *see also Pelzer*, 536 U.S. at 741-42 (finding that prison officials who used a "hitching post" to punish inmates were not entitled to qualified immunity despite the lack of a decision addressing the precise issue).

One of our sister circuits has held that in light of *Katz*, recording and disclosing a police officer's personal phone call to his wife on a police department telephone system is a clear violation of the Fourth Amendment and that the supervisor responsible for the recording was not entitled to qualified immunity. *Zaffuto v. City of Hammond*, 308 F.3d 485, 489 n.3 (5th Cir. 2002).[5] Another circuit, in a case involving text messages on a department-issued pager, found that in circumstances similar to those in the present case "it was clear at the time of the search that an employee is free from unreasonable search and seizure in the workplace." *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 909-10 (9th Cir. 2008) (citing *Ortega*).[6] We agree with those circuits that at the time of the recording in this case, it was sufficiently clear that govern-

---

[5] The conduct in *Zaffuto* involved both recording and disclosing a personal phone call, which may be a ground on which to distinguish *Zaffuto* from the present case. Once again, the parties dispute whether Bellwood made any use of the recordings in this case. We simply note that the Fifth Circuit found the right to privacy in personal communications on a city-issued phone line to be sufficiently clear to preclude a finding of qualified immunity.

[6] The Ninth Circuit in *Quon* ultimately found that a police chief was entitled to qualified immunity on a ground not applicable here. *See Quon*, 529 F.3d at 910.

ment employees enjoyed a reasonable expectation of privacy in the workplace to preclude qualified immunity.

## C. Title III claims

Lemm and Moore also moved for summary judgment on the appellees' claims that the Village of Bellwood violated Title III by surreptitiously recording phone calls from the finance department. This circuit, like a few others, recognizes qualified immunity as a defense to a lawsuit under Title III. *See Davis v. Zirkelbach*, 149 F.3d 614, 618 (7th Cir. 1998); *see also Tapley v. Collins*, 211 F.3d 1210, 1216 (11th Cir. 2000); *Blake v. Wright*, 179 F.3d 1003, 1013 (6th Cir. 1999). Lemm and Moore originally moved for summary judgment by presenting a qualified immunity defense to the 42 U.S.C. § 1983 claims in the complaint, but moved for summary judgment on other grounds with respect to the Title III claims. They then raised qualified immunity as a defense to the Title III claims in their reply brief.[7] The district court refused to consider the

---

[7] The defendants' motion for summary judgment raised several grounds for dismissing the Title III claims, including the consent and law enforcement exceptions to Title III, the requirement that a communication be intentionally intercepted and, in the reply brief, qualified immunity. The district court dismissed some of Narducci's claims pursuant to the consent exception but found that the law enforcement exception did not apply and that both defendants had intentionally intercepted calls within the meaning of Title III. On appeal, (continued...)

argument; the appellants had forfeited it, the court concluded, by not bringing it up in their original submission. (The appellants have provided, in the appendix to their appellate briefs, a second summary judgment submission with a more fulsome qualified immunity discussion. They filed this second motion after the district court issued its summary judgment opinion, however, and the district court did not grant them reconsideration.)

In proceedings before the district court, counsel for Lemm and Moore conceded that, "when we raised the argument of qualified immunity, we raised it only under the section that was entitled Fourth Amendment." That would seem to be the end of the issue, since the district court is entitled to find that an argument raised for the first time in a reply brief is forfeited. *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue."). Lemm and Moore contend, however, that they can also appeal the denial of qualified immunity under the collateral order doctrine. The classic formulation of the collateral order doctrine holds that a non-final decision of the district court can be reviewed if it falls within "that small class which finally determine claims of right separable from, and

---

[7] (...continued)

defendants do not raise those issues except insofar as they affect their qualified immunity defense, and so we only evaluate whether the district court correctly found that the qualified immunity defense was forfeited at summary judgment.

collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). While an appeals court can review a claim of qualified immunity after trial, and can vacate an adverse judgment if it finds that the officials are protected by qualified immunity, the doctrine is a protection from suit as well as a protection from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985). In this way, qualified immunity is like the right against double jeopardy; a court cannot very well vindicate a right not to stand trial after an official has already stood trial. Thus, an appeals court can review a denial of summary judgment on qualified immunity grounds so long as the denial was not because of a disputed factual issue. *Id.* at 530.

This argument does not get Lemm and Moore very far, however, because it merely supports jurisdiction over the appeal from the denial of summary judgment. As discussed above, the district court was entitled to find that Lemm and Moore waived the qualified immunity defense in the summary judgment proceedings because they failed to raise the issue before their reply brief. Of course, Lemm and Moore also presented a successive summary judgment motion to the district court, which it refused to consider. The collateral order doctrine may give them grounds to appeal the denial of (or rather, refusal to consider) that second motion. Our review on that issue is limited, because the filing of successive summary judgment motions is a matter within the dis-

cretion of the district court. *See Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995) ("the district court may, in its discretion, allow a party to renew a previously denied summary judgment motion or file successive motions, particularly if good reasons exist."). Lemm and Moore argue that the district court should have considered the qualified immunity issue at summary judgment because the defense is sufficiently important that the failure to consider it was plain error. *See Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1220-21 (7th Cir. 1984) (an argument will not be considered waived if it would result in a plain miscarriage of justice).

The present case does not support reversal on an otherwise forfeited ground, however. First, Lemm and Moore were represented by counsel below, and it is not unfair to hold them to the standards of waiver to which all counsel are held. Second, Lemm and Moore were the moving party for summary judgment; if they felt entitled to terminate the proceedings because of qualified immunity, they were required to bring that issue to the district court's attention. Finally, as the district court pointed out, the present case has been litigated since 2001, while the motions for summary judgment were submitted in 2006; five years is ample time for the defendants to develop the issue and present it in their initial motion.

We also note that Lemm and Moore have pled the defense of qualified immunity on the Title III claims and that it remains available as a basis for a motion for judgment as a matter of law during the course of a

trial in this case, or depending on the jury's verdict, as the basis for an appeal afterwards.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of the defendants' motion for summary judgment.